UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY ABERCROMBIE,
*as Administratrix of goods, chattels, and credits of*
*Liddie Mae Murphy*,

                                Plaintiff,

      -v-

ANDREW COLLEGE,

                                Defendant.

---

Case No. 04-CV-7717 (KMK)

OPINION AND ORDER

Appearances:

Matthew Dollinger, Esq.
Dollinger, Gonski & Grossman
Carle Place, New York
*Counsel for Plaintiff*

Charles M. Mirotznik, Esq.
Law Offices of Charles M. Mirotznik
New York, New York
*Counsel for Plaintiff*

Arthur G. Jacoby, Esq.
Richard Young Im, Esq.
Herrick, Feinstein LLP
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      The Complaint in this action alleges that Defendant Andrew College obtained an invalid

deed to the remainder interest of Ms. Liddie Mae Murphy's residence. Specifically, it is alleged

that the deed is an invalid testamentary instrument, and was otherwise obtained via fraud and

undue influence.  As relief, the Court is asked to impose a constructive trust over the residence and to grant punitive damages.

Andrew College brought this Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim and alleging that the Statute of Limitations had expired.  However, after the Motion was filed, Ms. Murphy passed away.  A niece, Nancy Abercrombie, was appointed Administratrix of Ms. Murphy's estate, and a dispute ensued between Abercrombie and Andrew College over the validity of Ms. Murphy's Will.  That dispute is pending before a Surrogate's Court in New York.

Abercrombie also was substituted as Plaintiff in this action.  She then moved to have this case dismissed on the ground that the probate exception to the Court's diversity jurisdiction applied.  In the alternative, Abercrombie moved to have the Court abstain, in light of proceedings ongoing in New York Surrogate's Court.

For the reasons discussed below, Abercrombie's application that this Court dismiss or stay this action is DENIED, and Defendant's Motion is GRANTED without prejudice to Abercrombie to seek leave to file an amended complaint.

I.    Background

A.  Ms. Murphy and Andrew College

Unless otherwise noted, the following facts are not in dispute.  Liddie Mae Murphy graduated in 1937 from Andrew College, a private, two-year liberal arts college in Georgia.  Ms. Murphy maintained a close relationship with her alma mater and, indeed, credited the College for her successful career as an entertainer and writer.  On December 14, 1967, Ms. Murphy purchased a townhouse ("the Property") in Manhattan.  (Compl. ¶ 8)  Over twenty years later, on

or about March 23, 1990, Ms. Murphy executed a deed of conveyance ("Deed") and a Remainder

Charitable Contribution Agreement ("Contribution Agreement") through which she gifted the

Property, located at 45 West 84th Street, New York, New York, to Andrew College and retained a

life interest for herself.  (Compl. ¶¶ 9, 18; Jakoby Decl. Ex. C)  Ms. Murphy was represented by

counsel at the time she executed the Deed and the Contribution Agreement.  (Compl. ¶ 25)

Andrew College took possession of the Deed, and later recorded it in the Office of the City

Register of the County of New York on March 11, 1992.[1]  (Compl. ¶ 14; Jakoby Decl. Ex. D)

### B. The Complaint and the Motion to Dismiss

This action was commenced in New York State Supreme Court on July 20, 2004 (Def.'s

Mem. of Law in Support of Def.'s Mot. To Dismiss ("Def.'s Mem.") Ex. A) and was removed to

this Court pursuant to 28 U.S.C. § 1441 on September 29, 2004.[2]  According to the Complaint,

---

[1] The Deed remained filed without protest until March 12, 2004, when a letter allegedly signed by Ms. Murphy was sent to Andrew College.  (Letter from Arthur G. Jakoby, Esq. ("Jakoby") to the Court, Ex. C, Sept. 30, 2005)  The letter was postmarked in Las Vegas, Nevada, which is where Abercrombie lives.  (Hr'g Tr. 4, Aug. 22, 2005)  In this letter, a "counter proposal" is made to Andrew College regarding the Property.  In particular, the letter claims that Ms. Murphy's desire was for the Property to house Drama and Fine Arts graduates from Andrew College while they pursued their careers in New York City.  (Letter from Jakoby to the Court, Ex. C, Sept. 30, 2005)  Believing that Andrew College in fact intended to sell the Property upon Ms. Murphy's death, the "counter proposal" was to have Ms. Murphy's "trusted friend," Segundo More, purchase the Property for $1,000,000, although the letter notes that it would take twelve years for Segundo to secure the funds for the purchase.  (Letter from Jakoby to the Court, Ex. C, Sept. 30, 2005)  As a "good faith gesture," however, the letter indicates that Segundo would forward $1,000 per month to Andrew College.  (Letter from Jakoby to the Court, Ex. C, Sept. 30, 2005).  Finally, the letter indicates that "[d]ocuments will be drawn up" to effectuate this proposal.  (Letter from Jakoby to the Court, Ex. C, Sept. 30, 2005)  Andrew College appears to have rejected the proposal, though there is no formal document in the record memorializing this position from the College.

[2] Though filed on July 20, 2004, the Complaint itself is dated July 1, 2004, the same day that Ms. Murphy apparently executed a power of attorney in favor of Abercrombie.  (Def.'s Timeline, Exs. 1 & 2, Aug. 22, 2005)

Ms. Murphy did not intend to convey an irrevocable *inter vivos* gift to Andrew College at the time the Deed and Contribution Agreement were signed. (Compl. ¶ 23) Instead, the Complaint alleges that Ms. Murphy thought the Deed was revocable and would not have signed it otherwise. (Compl. ¶ 24) The Complaint also alleges that Ms. Murphy was inadequately counseled, (Compl. ¶ 25) that Andrew College made fraudulent statements and exercised undue influence over her by taking advantage of her "advanced age, lack of business savvy, vulnerability, [and] loneliness," as well as the "affection and esteem" she held for the college. (Compl. ¶¶ 27, 31)

Andrew College filed a Motion to Dismiss on March 2, 2005, asserting that all of the claims in the Complaint are barred by the statute of limitations, that the Deed is not subject to the testamentary formalities required under New York law, and that the fraud allegations are insufficiently particularized. Plaintiff timely responded to the Motion, but the Court held off in its decision to permit the parties to complete the mediation process they had begun in January 2005.

C. Mediation and Guardianship

At a pre-motion conference held in December 2004, the Parties expressed a willingness to pursue mediation, which the Court ordered. (Hr'g Tr. 7, Aug. 22, 2005) It had been the Court's (and Andrew College's) expectation that the Parties themselves would participate in the mediation. However, counsel for Plaintiff advised the mediator and counsel for Andrew College the day of the first mediation session on January 14, 2005 that Ms. Murphy apparently had been hospitalized and that she would not be attending the mediation. (Hr'g Tr. 8, Aug. 22, 2005; Certification in Resp. to Def.'s Documentation Submitted to the Court on Aug. 22, 2005 ("Pl.'s Certification") Ex. 10) At the end of that first session, Andrew College requested a supervised

visit with Ms. Murphy, an idea that the mediator evidently endorsed. Within an hour of that session, however, counsel for Plaintiff notified counsel for Andrew College that Abercrombie had determined that "it would not be advisable" for even a supervised visit with Ms. Murphy.[3] (Def.'s Timeline, Ex. 3) A second mediation session was held on March 8, 2005, but again, Ms. Murphy did not attend.[4] (Hr'g Tr. 9, Aug. 22, 2005)

The mediation thereafter stalled, in large part it appears, due to Abercrombie's efforts to be appointed as Guardian for Ms. Murphy. In fact, Abercrombie submitted the Petition seeking her appointment as Guardian, pursuant to Article 81 of the New York Mental Hygiene Law, on April 5, 2005. (Def.'s Timeline, Ex. 6) While counsel for Ms. Murphy/Abercrombie notified the mediator of this filing, he did not notify the Court or counsel for Andrew College, until he sent a one-sentence letter on June 7, 2005.[5] (Pl.'s Certification, Ex. 15-18; Def.'s Timeline, Ex. 7) Nor

---

[3] Counsel did not ask Ms. Murphy if she wanted the visit. (Hr'g Tr. 25, Aug. 22, 2005)

[4] Counsel for Plaintiff has asserted that it was inappropriate for Ms. Murphy to attend any of the mediation sessions because of her "age, frailty, and medical infirmities." (Pl.'s Certification 8) Yet, counsel never has specified what was so difficult about Ms. Murphy attending a mediation in her home city, and never has provided any documentation to support that assertion. Moreover, there is no evidence in the record that Ms. Murphy was even made aware of the mediation efforts in this case, let alone made aware of Andrew College's offer to pay $109,000 per year of Ms. Murphy's medical costs. (Hr'g Tr. 24, Aug. 22, 2005)

[5] In its entirety, the letter reads: "This is to advise the Court that an Article 81 has been commenced. I will advise the Court accordingly." The letter fails to mention that the Article 81 proceedings had been pending for two months, and that the court handling the matter had set a return date. Counsel for Plaintiff claims the delay is explained by his desire to notify the Court only after the Order appointing a Guardian was signed. (Pl.'s Certification 13) In his view, this was proper because Article 81 "limits the people entitled to be noticed in the proceeding in order to protect the privacy of the alleged incapacitated person." (Pl.'s Certification 13) This is a curious claim because Counsel's June 7 letter notifying the Court and Andrew College pre-dated the Order appointing Guardians for Ms. Murphy by two weeks, as that Order was not signed until June 22. (Def.'s Timeline, Ex. 9) Thus, it remains entirely unclear why Counsel waited two months to notify the Court of these major developments in the case, particularly while the

did Counsel provide notice of Ms. Murphy's initial opposition to Abercrombie's efforts to become her Guardian. In Ms. Murphy's words: "While I once had a close relationship with NANCY ABERCROMBIE, I no longer maintain such a relationship with her, and do not trust her to manage my affairs." (Def.'s Timeline, Ex. 8 at 2) Instead of Abercrombie, Ms. Murphy proposed Segundo More be her court-appointed Guardian. (Def.'s Timeline, Ex. 8 at 1-2, 6) Ultimately, it appears that there was some resolution of the dispute, whereby Ms. Murphy consented to the appointment of: (i) Segundo More to be her Guardian; (ii) Segundo More and Abercrombie to be co-Guardians of Ms. Murphy's property; and (iii) Abercrombie as Special Guardian of the case against Andrew College.[6] (Pl.'s Certification, Ex. 23 at 2)

_____

Motion to Dismiss was still pending. Even if Counsel did not want to disclose anything to Andrew College, there is no credible explanation for Counsel's decision to keep the Court in the dark.

It also bears noting that counsel for Plaintiff did not advise the Court that there had been some question about whether Ms. Murphy had revoked Abercrombie's power of attorney on March 14, 2005, less than one week after the last mediation session, and three weeks before Abercrombie sought to become Ms. Murphy's Guardian. (Def.'s Timeline, Ex. 4) Finally, the Court was not notified that Ms. Murphy may also have been the victim of an insidious effort by a doctor to take control of the Property, an effort that was rebuffed by Abercrombie during the spring of 2005. (Pl.'s Certification, Ex. 12-14)

[6] When asked at the proceeding in New York Supreme Court if she consented to this arrangement, Ms. Murphy replied: "What else can I do with all these handsome people in here?" (Pl.'s Certification, Ex. 23 at 2)

How this settlement came to be is a mystery, but the record reflects that when Ms. Murphy was interviewed by the court appointed evaluator, she told him that she was "suspicious of . . . Abercrombie," believing that Abercrombie "may want her house." (Pl.'s Certification, Ex. 22 at 11) However, other members of Ms. Murphy's family endorsed Abercrombie as an acceptable Guardian. (Pl.'s Certification, Ex. 22 at 13) Though not considered in the Motions pending before this Court, it should be noted that the evaluator also reported that Ms. Murphy allegedly indicated that she never thought the Deed for the Property was irrevocable. (Pl.'s Certification, Ex. 22 at 14)

D. Ms. Murphy's Declining Health and Demise

On August 1, 2005, Ms. Murphy was critically injured in an apparent fall. (Hr'g Tr. 11, Aug. 22, 2005) For this she was hospitalized at Roosevelt St. Luke's and listed in critical condition. (Hr'g Tr. 12, Aug. 22, 2005) Sometime soon thereafter, Abercrombie, though not appointed as Ms. Murphy's Guardian, sought a health care proxy to remove Ms. Murphy from life support. (Hr'g Tr. 12, Aug. 22, 2005; Def.'s Timeline, Ex. 10) An attorney for Segundo More, the court-appointed Guardian for Ms. Murphy, made an emergency, *ex parte* application to restrain St. Luke's Hospital from removing Ms. Murphy's life support and to declare any health care proxies to be declared null and void. (Def.'s Timeline Ex. 10) On August 15, 2005, the Honorable William J. Davis, Justice of the Supreme Court of New York, who had been presiding over the guardianship proceedings, revoked all previously-issued health care proxies.[7] (Def.'s Timeline, Ex. 11 at 10)

Ms. Murphy never recovered from the fall and passed away on September 25, 2005. The cause of death was determined to be "[b]lunt impact injury of the head with multiple complications including sepsis following bowel perforation by ventriculoperitoneal shunt." (Letter from Jakoby to the Court, Ex. D, February 7, 2006) Eventually, without the opposition of Andrew College, Abercrombie was substituted for Ms. Murphy as Plaintiff in this case.[8] (Order,

_____

[7] Plaintiff's counsel never notified this Court of any of these developments.

[8] According to Federal Rule of Civil Procedure 25(a)(1), a party may make a motion for substitution of a deceased party within ninety days from when the Suggestion of Death is made on the record. Fed. R. Civ. P. 25(a)(1). Plaintiff Abercrombie filed a timely substitution motion, on February 21, 2006, as less than 90 days had passed from January 24, 2006, when Plaintiff's counsel filed the Suggestion of Death with the Court. Because, by this point, Abercrombie had obtained appointment as Administratrix of Ms. Murphy's estate and retained Ms. Murphy's former counsel, it was appropriate for Plaintiff's counsel to file the Suggestion of Death on

### E. The Fight over Ms. Murphy's Will

The day after Ms. Murphy's death, Abercrombie, assisted by the same counsel originally representing Ms. Murphy in this action, filed a Petition in Surrogate's Court in New York seeking the issuance of Letters of Administration. (Letter from Jakoby to the Court, Ex. B, Feb. 7, 2006) In this application, Abercrombie asserted that Ms. Murphy died without a Will. (*Id.*) She also claimed that Ms. Murphy's estate included the Property, which she represented had a value of approximately $4,000,000, as well as Ms. Murphy's interest in this action, which she described as being brought to "rescind a deed" based on undue influence and fraud. (*Id.*) However, Abercrombie did not mention in the application that the contested deed related directly to the very property that she claimed was already part of Ms. Murphy's estate. Nonetheless, Abercrombie was appointed Administratix of Ms. Murphy's estate on December 23, 2005. (Letter from Jakoby to the Court, Feb. 24, 2006)

Abercrombie's claim that Ms. Murphy died intestate may be inaccurate as Andrew College claims knowledge of a Will allegedly executed on February 11, 1998 by Ms. Murphy. This Will names former Andrew College president Kirk Treible as executor (and a neighbor as Alternate Executor). (*See* Letter from Jacoby to the Court, Feb. 7, 2006, Ex. C) Indeed, after discovering that Abercrombie had asserted that Ms. Murphy died intestate, Andrew College initiated proceedings for the probate of the purported Will on January 26, 2006.[9] (*See* Letter

---

behalf of the estate. *See Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993).

[9] Notwithstanding their demonstrated stinginess in the disclosure of information material to this case, Abercrombie's counsel have protested Andrew College's decision not to disclose the existence of the purported Will until February 2006. In particular, counsel insinuates that there

from Jacoby to the Court, Ex. D, Feb 7, 2006)  It has been estimated that these proceedings could take several years.  (Hr'g Tr. 37, Feb. 16, 2006)

### F.  Abercrombie's Application to Dismiss the Action

When the Court first learned of Ms. Murphy's passing in October 2005, it asked the

---

was something improper about Andrew College's non-disclosure of the Will even while the Motion to Dismiss was *sub judice*.  (Letter from Floyd G. Grossman ("Grossman") to the Court, 3, Feb. 10, 2006)  Indeed, had the Will provided evidence that supported the initial claim that the Deed was invalid, then the Court too might have been concerned about the tardy disclosure of the Will.  However, whether or not valid, the Will's contents are fully consistent with Andrew College's claims regarding the Deed.  In fact, after bequeathing $47,000 of assets to 21 beneficiaries (but not Abercrombie), the Will provides:

> I give all the rest of my property, whether real or personal, wherever located, to Andrew College, a Georgia not-for-profit corporation established in 1854 and located in Culbert, Georgia 31740.  Andrew College is my alma mater and was a source of inspiration and encouragement to me during all of the days of my adult life.  This gift is made as a reflection of my special appreciation for the part that Andrew College played in my life.  I specifically request that Andrew College take any books which I have authored and which are located in my home at 45 West 84th Street in Manhattan [the Property] and place them to their best use which may include selling, gifting or presenting them as recognition to those associated with Andrew College.

> I request that Andrew College consider the use of the earlier gift of my home located at 45 West 84th Street in Manhattan as a location for student study or income production for the College.  In the event that the College does not find this feasible, it is requested that the property located at 45 West 84th Street be sold only to an individual who will use it as a private residence with the assurance that the interior remain faithful to the period in which the house was originally designed and built.

(Letter from Jakoby to the Court, Ex. C. at 3, Feb. 7, 2006)  Of course, the Court does not decide either the validity of the Will or the Deed itself based on the contents of the Will, but only quotes from the Will to put into context Plaintiff's Counsel's concerns regarding timing of the disclosure of the Will.

parties to submit a schedule to brief the question of whether the Court had jurisdiction over this case.  Instead of a schedule, the Court received a series of letters in February and March 2006 outlining the Parties' positions regarding jurisdiction.  In these letters, Abercrombie asserts that the Court lacks jurisdiction under the probate exception, or, in the alternative, contends that the Court should abstain until the proceedings in Surrogate's Court are completed.  Andrew College asserts otherwise, claiming that this action presents issues separate from those before the Surrogate's Court.[10]

## II.  Discussion

### A.  Abercrombie's Jurisdictional Objections

Originally, neither Party challenged this Court's jurisdiction to hear this case.  The Parties are from different states, and the amount in controversy is far over $75,000.  *See* 28 U.S.C. § 1332.  However, now that Ms. Murphy has passed away and a battle has ensued in Surrogate's Court over her Will, Abercrombie asserts that this Court has lost jurisdiction because of the probate exception.  In the alternative, Abercrombie urges the Court to abstain from further presiding over this case, in deference to the recently-begun proceedings in Surrogate's Court.  This Court rejects both arguments.

#### 1.  The Probate Exception

"The probate exception is 'one of the most mysterious and esoteric branches of the law of

---

[10] In addition, on several occasions, Andrew College has expressed concern that Abercrombie has moved into the Property and otherwise has failed to properly manage the property.  (Letter from Jakoby to the Court, Feb. 7, 2006; Letter from Jakoby to the Court, Feb. 27, 2006; Letter from Jakoby to the Court, Mar. 13, 2006; Letter from Jakoby to the Court, Jun. 2, 2006; Hr'g Tr. Mar. 2, 2006)

federal jurisdiction.'" *Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d

1065, 1071 (2d Cir. 1990) (quoting *Dragan v. Miller*, 679 F.2d 712, 713 (7th Cir. 1982)).  It is a

"judicially created doctrine[] stemming in large measure from misty understandings of English

legal history." *Marshall v. Marshall*, – – U.S. – –, 126 S. Ct. 1735, 1741 (2006); *see also* Peter

Nicolas, *Fighting the Probate Mafia:  A Dissection of the Probate Exception to Federal

Jurisdiction*, 74 S. Cal. L. Rev. 1479, 1501-20 (2001).  The uncertain history notwithstanding,

the Supreme Court long ago defined the core of the exception to mean that "a federal court has

no jurisdiction to probate a will or administer an estate . . . ." *Markham v. Allen*, 326 U.S. 490,

494 (1946).  Under this exception, federal courts "have jurisdiction to entertain suits 'in favor of

creditors, legatees and [heirs]' and other claimants against a decedent's estate 'to establish their

claims' so long as the federal court does not interfere with the probate proceedings or assume

general jurisdiction of the probate or control of the property in the custody of the state court." *Id.*

(quoting *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43 (1909)); *see also

Moser v. Pollin*, 294 F.3d 335, 340 (2d Cir. 2002).

     Owing perhaps to its murky past, the probate exception has been "expansively"

interpreted by the courts.  *Marshall*, 126 S. Ct. at 1741.  *Markham* represented the Supreme

Court's first "endeavor[] . . . to curtail the 'probate exception.'"  *Id.*  To address yet another wave

of overly-elastic application of the exception, the Supreme Court recently and unanimously

reminded the lower courts in *Marshall* that the probate exception is "narrow," and should not be

used as an excuse to decline to exercise jurisdiction over actions merely because they involve a

"probate related matter."  *Id.* at 1741, 1744.

     In *Marshall*, the Ninth Circuit "read the probate exception broadly to exclude from the

federal courts' adjudicatory authority 'not only direct challenges to a will or trust, but also questions which would ordinarily be decided by a probate court in determining the validity of the decedent's estate planning instrument.'"[11] *Id.* at 1741 (quoting *Marshall v. Marshall*, 392 F.3d 1118, 1133 (9th Cir. 2004)). The Ninth Circuit also held that a "State's vesting of exclusive jurisdiction over probate matters in a special court strips federal courts of jurisdiction to entertain any 'probate related matter,' including claims respecting 'tax liability, debt, gift, [or] tort.'" *Id.* (quoting *Marshall*, 392 F.3d at 1136). In reversing, the Supreme Court held that "the Ninth Circuit had no warrant from Congress, or from decisions of this Court, for its sweeping extension of the probate exception." *Id.* In particular, the Supreme Court held that the Ninth Circuit erred in applying the probate exception to a case where a party made a claim of tortious interference with a gift or inheritance and sought an *in personam* judgment, and not the probate or annulment of a will.[12] *Id.* at 1748. In reaching this result, the Court reiterated that "the probate exception

---

[11] The particular estate planning instrument in question was an *inter vivos* gift that allegedly had been offered during the decedent's lifetime, and which allegedly had been tortiously interfered with by the beneficiary of decedent's will. This claim, it was argued to the Ninth Circuit, was outside the boundaries of the probate exception. The Ninth Circuit disagreed, holding that the "probate exception applies not only to contested wills, but also to trusts that direct a post mortem disposition of the trustor's property." *Marshall*, 392 F.3d at 1135.

[12] In its discussion of the lower courts' application of the probate exception, the Supreme Court commented, with a hint of disapproval, on the holdings of some circuit courts that had applied the probate exception to "a range of matters well beyond the probate of a will or administration of a decedent's estate," citing, among others, *Storm v. Storm*, 328 F.3d 941 (7th Cir. 2003), which held that the probate exception bars jurisdiction over a claim that the defendant tortiously interfered with the plaintiff's inheritance by causing amendment to an irrevocable *inter vivos* trust. 126 S. Ct. at 1748. The Ninth Circuit, in fact, relied on *Storm* in rejecting the claim that the probate exception does not apply to a claim of tortious interference with an *inter vivos* gift. *Marshall*, 392 F.3d at 1135. It also may be of some interest to note that in addressing the reach of the probate exception in *Marshall*, the Ninth Circuit explicitly "adopt[ed] the framework for analysis laid out by the Second Circuit in *Moser v. Pollin*, 294 F.3d [at] 340 . . . ." *Id.* at 1132. In reversing the Ninth Circuit's decision, however, the Supreme Court offered no remarks

reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Id.* However, the exception "does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction."[13] *Id.*

With this backdrop, the Court now turns to the application of the probate exception to this case. Determining whether a case falls within the probate exception requires a two-part inquiry. First, the district court sitting in diversity must determine if it is "being asked to directly probate a will or administrate an estate." *Markham*, 326 U.S. at 494; *see also Moser*, 294 F.3d at 340. If so, the action is outside of the court's jurisdiction, as such actions are "purely probate" in nature. *Markham*, 326 U.S. at 494. Second, if the first question is answered in the negative, the court must determine if the case at hand would require the district court to "interfere with the probate proceedings, [] assume general jurisdiction of the probate[,] or control [] property in the custody of the state court." *Moser*, 294 F.2d at 340; *see also Markham*, 326 U.S. at 494. In any of these situations, the district court must dismiss the case for lack of subject matter jurisdiction. *See Moser*, 294 F.3d at 340.

Abercrombie argues that this case is covered by both prongs of the probate exception analysis. First, she claims that this Court "is now being asked by Andrew College to determine the validity of the purported Will, and to administer the estate [of] Liddie Mae Murphy, which includes the claims made in this lawsuit." (Letter from Matthew Dollinger ("Dollinger") to the

---

about *Moser*.

[13] The Court also rejected the Ninth Circuit's alternative holding that the state probate court's declaration of exclusive jurisdiction was binding on the federal courts. *Id.* at 1749-50.

Court, Feb. 10, 2006)  However, this is clearly not the case.  As noted in *Moser*, since "few practitioners would be so misdirected as to seek . . . letters testamentary or letters of administration from a federal judge, the first prong of the probate exception is rarely, if ever, violated."  *Moser*, 294 F.3d at 340.  Andrew College has not submitted the Will to this Court in an attempt to have it declared valid; additionally, even had it done so, this Court would decline to make such a determination.  Jurisdiction thus cannot be denied on this ground.

Plaintiff Abercrombie next asserts that "by adjudicating Andrew College's motion to dismiss . . . the District Court would improperly take control of property now in the custody of the Surrogate's Court and would directly interfere with ongoing estate proceedings."  (Letter from Dollinger to the Court, 4-5, Feb. 10, 2006)  The Court is unpersuaded.

First, this Court is not "assum[ing] general jurisdiction of the probate" of Ms. Murphy's estate.  *Moser*, 294 F.3d at 340.  A federal court only assumes jurisdiction of the probate where "'the federal district court . . . entertains a cause of action that under state law . . . would be cognizable only by the probate court.'"  *Estate of Genecin v. Genecin*, 363 F. Supp. 2d 306, 312 (D. Conn. 2005) (quoting *Moser*, 294 F.3d at 341); *see also Wells Fargo Bank, N.A. v. Stern*, No. Civ. 02-5126 SI, 2003 WL 22114268, at *2 (N.D. Cal. 2003) ("'The standard for determining whether federal jurisdiction may be exercised is whether under state law the dispute would be cognizable only by the probate court.'" (quoting *Lamberg v. Callahan*, 455 F.2d 1213, 1216 (2d Cir. 1972)). Very little actually falls into this category in New York, as "the Surrogate's Courts share concurrent subject matter jurisdiction with the state's court of general jurisdiction . . . ." *Moser*, 294 F.3d at 341.  Despite the wide jurisdiction of the Surrogate's Court, a New York

State Supreme Court would not need to refrain from exercising jurisdiction over this case.[14]  *See*

*Pollicina v. Misericordia Hosp. Med. Ctr.*, 624 N.E.2d 974, 977 (N.Y. 1993) ("Although the

Surrogate's Court is the primary forum for proceedings involving estates and intestacies, the

Supreme Court's inviolate authority to hear and resolve all causes in law and equity

unquestionably extends to such matters as well."); *In re Burns*, 731 N.Y.S.2d 537, 539 (App.

Div. 2001) (holding that Supreme Court had concurrent jurisdiction over question of *inter vivos*

charitable donations, even after donor's passing); *People v. Ekinici*, 743 N.Y.S.2d 651, 656 (Sup.

Ct. 2002) ("[T]he Supreme Court has concurrent jurisdiction with the Surrogate's Court on all

matters relating to a decedent or the estate."); *Berger v. Ickovicz*, 669 N.Y.S.2d 488, 491-92

(Sup. Ct. 1998) (declining to transfer case to Surrogate's court where Surrogate's Court was not

in an "unique position" to hear the case, and the disposition of the estate was not directly affected

by the case).  Indeed, this action was first filed in New York Supreme Court, so it is difficult to

understand how Abercrombie, purportedly acting in the interests of Ms. Murphy's estate, could

believe that only the Surrogate's court should adjudicate this case.[15]  Thus, because this dispute

---

[14] The New York statute mirroring the probate exception is N.Y. C.P.L.R. § 325(e), providing:  "Where an action pending in supreme court affects the administration of a decedent's estate which is within the jurisdiction of the surrogate's court, the supreme court, upon motion, *may* remove the action to such surrogate's court upon the prior order of the surrogate's court." *Id.* (emphasis added).  Under this statute, while the courts of general jurisdiction may often defer to the Surrogate's Court in probate related disputes, nothing about that "policy" vitiates "the Constitutional grant of jurisdiction [of probate related matters] to the State Supreme Court." *Celentano v. Furer*, 602 F. Supp. 777, 780 (S.D.N.Y. 1985).

[15] There is some authority suggesting that the Surrogate's Court would not have jurisdiction to determine the validity of the Deed because the allegedly tortious acts of Andrew College took place while Ms. Murphy was alive.  *See Greenfield v. Realty Funds, Inc.*, 221 N.Y.S.2d 402, 404 (App. Div. 1961) ("It is doubtful that the Surrogate's Court would have jurisdiction of the action to set aside the transfer of the real property in view of the fact that the relief sought is by plaintiff individually against defendants . . . for their acts before the death of

would note be solely cognizable by the New York Surrogate's Court, this aspect of the probate exception does not apply.

Second, this Court is not controlling property in the custody of the state court. Abercrombie argues otherwise, claiming that under *Byers v. McAuley*, 149 U.S. 608 (1893), the possession of a decedent's property by the administrator appointed in state court "is a possession taken in obedience to the orders of [the state] court; [and the property] is the possession of the court, and it is a possession which cannot be disturbed by another court." *Id.* at 615. Abercrombie contends that since she has been appointed Administratrix of Ms. Murphy's estate by the New York Surrogate's Court, all of Ms. Murphy's estate (including the Property) is now in the possession of the state court.[16]

This reasoning is flawed on multiple grounds. To begin, Abercrombie's reliance on *Byers* is misplaced, because in that case the state court had already carried out a good portion of the administration of the estate, and the jurisdiction exercised by the federal circuit court interrupted that administration. *See Byers*, 147 U.S. at 612, 620 (noting that debts of the estate

---

their mother . . . ."); *The Vanderbilt Museum v. Am. Ass'n of Museums*, 449 N.Y.S.2d 399, 403 (Sup. Ct. 1982) ("The power of the Surrogate's Court relates to matters affecting estates of decedents and not to independent matters involving controversies between living persons." (citations omitted)).

[16] Due to Abercrombie's apparent belief that, as Administratrix, she may do with Ms. Murphy's property what she wishes, and based upon allegations raised by Andrew College that items were removed from the property, this Court ordered Abercrombie to not "dissipate the value of the Property, which includes not removing any assets of the Property from premises." (Order, Feb. 18, 2006)  After Andrew College further reported items leaving the Property after the Order, this Court ordered Abercrombie to submit a sworn affidavit listing all items removed from the Property and detailing their destination.  (Order, Mar. 6, 2006) The Court did not, however, require her to return the removed property.  Nor has the Court prohibited Abercrombie from being at or otherwise managing the Property, or otherwise done anything inconsistent with any orders of the Surrogate's Court or with maintaining the status quo regarding the property.

had been paid and estate was ready for distribution under administration of state court). Here, the record is devoid of any evidence that the Surrogate's court has taken any affirmative action regarding the Property, which appears to be an element of control. *Cf. In re The Thomas & Agnes Carvel Found.*, 36 F. Supp. 2d 144, 150 (S.D.N.Y. 1999) ("The Surrogate's Court clearly has taken control of the property subject to this claim for injunctive relief by restraining its transfer or encumbrance.").

More importantly, however, the property at issue in *Byers* remained in the decedent's full possession until her death, and was thus considered an asset of the estate. *See Byers*, 149 U.S. at 608. Indeed, the question in *Byers* was not whether an *inter vivos* transfer was valid, but instead, whether a written instrument containing instructions for the sale of the property was valid as a will. *Id.* at 608, 618. In *Byers*, the property at issue automatically became part of the estate which was before the state court upon the decedent's death, whereas here, there is no basis in law to deem the Property to be part of Ms. Murphy's estate, and therefore, under the control of the Surrogate's Court, until the Deed is declared invalid.

Abercrombie disagrees, implicitly contending that solely by virtue of her statement in the Petition for Letters of Administration that Ms. Murphy died intestate and that the Property was part of her estate upon her demise, the Property is somehow under the control of the Surrogate's Court. This claim falls far short of the mark. First, the Court is troubled by the deceptive nature of Abercrombie's Petition, which omits the fact that there is a recorded Deed for the Property that transferred it to Andrew College, reserving only a life interest for Ms. Murphy. Specifically, in the Petition, Abercrombie (aided by the same counsel who initiated this lawsuit allegedly on behalf of Ms. Murphy) lists the Property as part of Ms. Murphy's real property, making no

mention of the Deed.  In another section intended to cover the decedent's interest in any lawsuits over property "[i]n addition to the personal property listed elsewhere in the Petition," Abercrombie is careful to mention only that Ms. Murphy has an interest in a legal action to rescind "*a* deed," without mentioning that the deed at issue involves the very same property she claims is already part of Ms. Murphy's estate.  (Letter from Jakoby to the Court, Ex. B, Feb. 7, 2006 (emphasis added))  Thus, a court reviewing Abercrombie's application, without access to any other information, would believe that Ms. Murphy owned the Property upon her death, *in addition to* possessing an interest in an on-going lawsuit involving a deed for some *other* property.  Of course, this Court knows there is more to the story than what Abercrombie has shared with the Surrogate's Court and, therefore, finds that the shady Petition by itself does not divest this Court of jurisdiction over the question of the validity of the Deed.

Second, Abercrombie's mere belief that the Deed is invalid, and therefore that the Property presumptively should currently be considered part of Ms. Murphy's estate, has no foundation in the law.  Indeed, the whole point of the initial action begun in Ms. Murphy's name was to have the Deed declared invalid, both as a matter of law and allegedly as a result of fraud and undue influence.  (Compl. ¶¶ 14, 16, 32)  If Abercrombie's assertion were true, then there would have been no need to bring the action before this Court.  But, the law in New York is clear that a properly recorded deed is presumptively valid.  *See Munoz v. Wilson*, 18 N.E. 855, 858-59 (N.Y. 1888) (holding that a recorded deed is prima facie evidence of delivery of property); *Jonap v. Norwick*, 444 N.Y.S.2d 870, 872 (App. Div. 1981) ("Since the deed was recorded, there is a presumption that title passed.").  Thus, unless and until some judicial authority accepts Abercrombie's objections to the validity of the Deed, which was recorded on March 11, 1992,

the Property is not part of Ms. Murphy's estate, but in fact belongs to Andrew College. *Cf.*

*Michigan Tech Fund v. Century Nat'l Bank of Broward*, 680 F.2d 736, 740-41 (11th Cir. 1982)

("At this stage, the mortgage is not part of the estate's assets. Because the face of the mortgage

reveals that Mr. and Mrs. Johnson held it as tenants by the entireties, upon Mr. Johnson's death

Mrs. Johnson took the mortgage free and clear of any need for it to pass through the probate

court. Thus, the Fund must succeed in achieving reformation before the mortgage will become

part of the estate currently under control of the state probate court."); *Bugbee v. Donahue*, 483 F.

Supp. 1328, 1331 (E.D. Wisc. 1980) ("The real estate involved in this case, although listed as an

asset in the decedent's estate, is in fact an asset only if the plaintiff is successful in his claim

against the defendants. Thus, this Court in allowing the action to continue will not be assuming

control of property in a state court's custody, nor will it be assuming general jurisdiction of the

probate of the decedent's estate."). Instead, the Deed presumptively mandates that the Property

belongs to Andrew College.

Finally, there is the third question of whether this proceeding will "interfere" with the

probate proceedings taking place in the Surrogate's Court. "[I]t is well settled that the fact this

Court is asked to adjudicate whether certain assets belong to the Estate 'standing alone, does not

constitute interference' sufficient to trigger the probate exception." *Genecin*, 363 F. Supp. 2d at

312 (quoting *Ashton*, 918 F.2d at 1072). Indeed, as noted, the purpose of this lawsuit was to

increase Ms. Murphy's assets (and now, those of her estate) by reclaiming the Property that had

been deeded to Andrew College. The Complaint contains claims, among others, that Andrew

College committed a tort by exercising undue influence over Ms. Murphy and by making certain

fraudulent statements to induce her to give up the Property. As such, the lawsuit at least in part

sounds in tort and therefore is precisely the type of action that routinely is found to be outside the bounds of the probate exception. *See, e.g., Giardina v. Fontana*, 733 F.2d 1047, 1050-51 (2d Cir. 1984) ("The heart of Giardina's complaint was her allegation that the assignment of her interest in her deceased father's estate was obtained by undue influence and fraud. This is essentially a common law tort action. The principal relief requested was a declaratory judgment that the assignment was null and void and/or a rescission of the assignment. This relief could be granted without in any way interfering with the probate proceedings in Florida or the estate being administered."); *Gearheard v. Gearheard*, 406 F. Supp. 704, 706 (S.D. Miss. 1976) (holding that jurisdiction over lawsuit challenging *inter vivos* gift was proper as the lawsuit was intended to add to the assets of the estate and determination of the claims would not interfere with probate proceedings). Thus, this is a very different issue than deciding where property within an estate should be distributed. In that situation, where an action "asks the court to order the sale of an asset of the estate," it is proper for the federal court not to entertain jurisdiction. *In re Estate of Threefoot*, 316 F. Supp. 2d 636, 644 (W.D. Tenn. 2004). This case does not ask the Court to decide how to distribute any assets of Ms. Murphy's estate, but only to determine whether additional assets, i.e., the Property, should be added to the estate, thus making the probate exception inapplicable.

Even if this Court was to come to a decision while the Surrogate's Court proceedings were ongoing, the decision would not interrupt the process in state court. The federal court should not assume jurisdiction where the final determination "would be binding on the proceeding still pending before the Surrogate's Court," *Moser*, 294 F.3d at 342, but that is not the case here. As Abercrombie's counsel conceded at oral argument, the validity of the Deed will not

determine the validity of the Will, and vice versa. (Hr'g Tr. 12, Feb. 16, 2006) Put another way, a decision by this Court would not leave the Surrogate's Court to perform "no function" at all, as the Surrogate's Court would still have the question of the Will itself before it. *See Moser*, 294 F.3d at 342; *see also Genecin*, 363 F. Supp. 2d at 312 ("While the Orphans' Court, 'will be obliged to give full faith and credit' to this Court's ruling, the Orphan's Court 'will continue to administer' the Estate." (quoting *Ashton*, 918 F.2d at 1072)). Therefore, the probate exception does not bar this Court from maintaining jurisdiction over this case.

### 2. Abstention

As an alternative to the jurisdiction claim, Abercrombie asks this Court to abstain from further adjudication of this case for three reasons. First, she asserts that abstention is prudent because the proceedings in Surrogate's Court may affect her standing to pursue this action. (Letter from Dollinger to the Court 4, Feb. 21, 2006; Letter from Dollinger to the Court, March 6, 2006) Second, Abercrombie contends that abstention is appropriate here because it avoids overlapping litigation between the state court proceedings and this action, which she asserts involves only a request for declaratory relief. (Letter from Dollinger to the Court 2-4, Feb. 21, 2006) Third, she claims abstention is appropriate because of the strong state interests in the matters in dispute. (Letter from Dollinger to the Court 5, Feb. 21, 2006) None of these asserted claims justifies abstaining in this case.

First, with regard to standing, Abercrombie, in what may be the most revealing comment about this lawsuit, contends that the Court should abstain because of the possibility that the Surrogate's Court may determine, as a result of adjudicating the validity of the Will currently in probate, that she should not be Administratix of Ms. Murphy's estate and, therefore, she would

21

lose "her right to pursue" this case, either before this Court or on appeal. (Letter from Dollinger to the Court 1, March 6, 2006) However, what is at stake in this action is not Abercrombie's right to pursue anything, let alone her self-interested desire to continue this lawsuit, but the best interests of Ms. Murphy's estate. Put bluntly, if Andrew College committed a wrong here, it was Ms. Murphy, and not Nancy Abercrombie, who was directly harmed. And, therefore, it is Ms. Murphy's estate, and not Nancy Abercrombie, that has a valid interest in pursing bona fide litigation to resolve that question. Thus, because Ms. Murphy is no longer alive, it will be incumbent upon, and, indeed the obligation of, *any* person who is properly appointed Administratix of Ms. Murphy's estate to bring any non-frivolous legal actions to protect the legitimate interests of Ms. Murphy's estate. *See In re Ehmer*, 681 N.Y.S.2d 553, 554 (App. Div. 1998) ("The appellant, in her capacity as temporary administratix, possessed the authority to commence legal actions to benefit the estate, including commencing actions to recover estate assets."); *In re Estate of Edward M. Stanley*, 660 N.Y.S.2d 107, 108 (App. Div. 1997) (holding that co-administrator of estate, even though also a legatee, may use estate funds to pursue bona fide litigation in the interests of the estate); *Spatz v. Bajramoski*, 624 N.Y.S.2d 606, 607 (App. Div. 1995) (rejecting claim that plaintiff lacked standing, noting that temporary administrator of estate "had full authority" as executrix of decedent's will to bring action "seeking to recover and preserve those assets wrongfully diverted from the decedent's estate"). Thus, while it may very well be that Abercrombie ultimately will not be appointed to serve the critical role of administratix of Ms. Murphy's estate, this does not mean that Ms. Murphy's estate will lose its standing to pursue its valid interests in pressing this lawsuit. Therefore, the question of Abercrombie's "standing" to pursue her "right" to be a plaintiff in this case is no basis to avoid

exercise of this Court's jurisdiction.[17]

Abercrombie's second argument in favor of abstention — the desire to avoid piecemeal litigation — is no more persuasive. Abstention is a judicially-created doctrine born out of the notion that even where "a federal court does have jurisdiction of a particular proceeding," it may abstain from exercising that jurisdiction out of "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 724 (1996). This doctrine has been broken down into four categories: (1) to avoid decision of a federal constitutional question arising in a case which may be disposed of on questions of state law; (2) to leave resolution of unsettled questions of state law bearing on important policy problems to the state courts; (3) to avoid interference with a pending state criminal proceeding; and (4) to avoid duplicative litigation based on considerations of wise judicial administration. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814-17 (1976); *see also Village of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1999). It is the last category, known as *Colorado River* abstention, upon which Abercrombie principally

---

[17] Contrary to Abercrombie's claim, *Rivera v. Rivera*, No. 91 Civ. 4706, 1994 WL 116038 (S.D.N.Y. Mar. 28, 1994), does not help her position. In *Rivera*, the plaintiff brought an action under the Tucker Act, 28 U.S.C. § 1346(A)(2), to recover a reimbursement of excess mortgage payments to defendant, who had been appointed administratix of the estate. Plaintiff claimed that the payment was improper because she was the sole owner of the real property, and that defendant had committed fraud both in claiming to be the co-owner and in being appointed as administratix. *Id.* at *1-2. However, the state court already had rejected plaintiff's claim of sole ownership of the property, and that ruling was on appeal. *Id.* at *1. In *Rivera*, Judge Sotomayor observed that plaintiff's Tucker Act claim was "wholly dependent on defendant's status as administratix of [the] estate and the plaintiff's claim of being the sole owner of the mortgaged property." *Id.* at *2. Because the merits of this lawsuit on behalf of Ms. Murphy's estate depend not a whit on the identity of the administrator ultimately appointed by the Surrogate's court, *Rivera* is plainly distinguishable and therefore offers no support for Abercrombie's claim.

relies.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule."
*Colorado River*, 424 U.S. at 813.  Indeed, in deciding whether to abstain, federal courts must
remember their "virtually unflagging obligation . . . to exercise the jurisdiction given them."  *Id.*
at 817; *see also Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("It is most true that this Court will
not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction, if it
should . . . .").  A federal district court should abstain from deciding a case correctly before it,
therefore, only when doing so would "clearly serve an important countervailing interest."
*Colorado River*, 424 U.S. at 813 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S.
185, 188-89 (1959)); *see also Estee Lauder Cos. v. Batra*, No. 06 Civ. 2035, 2006 WL 1188183,
at *7 (S.D.N.Y. May 4, 2006) ("The abstention doctrine is a narrow exception to the duty of a
district court to adjudicate a controversy properly before it when parallel state proceedings are
ongoing upon a finding of 'exceptional circumstances' that warrant it." (citing *Colorado River*,
424 U.S. at 813)).

"The principles of *Colorado River* are to be applied only in situations 'involving the
contemporaneous exercise of concurrent jurisdictions.'"  *Dittmer v. County of Suffolk,* 146 F.3d
113, 117-18 (2d Cir. 1998) (quoting *Kirkbride v. Cont'l Cas. Co.*, 933 F.2d 729, 734 (9th Cir.
1991)).  Put differently, "a finding that the concurrent proceedings are 'parallel' is a necessary
prerequisite to abstention under *Colorado River.*"  *Id.* at 118.  "Federal and state proceedings are
'concurrent' or 'parallel' for purposes of abstention when the two proceedings are essentially the
same; that is, there is an identity of parties, and the issues and relief sought are the same."  *Nat'l
Union Fire Ins. Co. of Pittsburgh v. Karp,* 108 F.3d 17, 22 (2d Cir. 1997); *see also Great South*

*Bay Med. Care, P.C. v. Allstate Ins. Co.*, 204 F. Supp. 2d 492, 496 (E.D.N.Y. 2002) ("Lawsuits are considered 'parallel' if 'substantially the same parties are contemporaneously litigating substantially the same issues in different forums.'"). "Complete identity of parties and claims is not required; the parallel litigation requirement is satisfied when the main issue in the case is the subject of already pending litigation." *GBA Contracting Corp. v. Fid. & Deposit Co. of Maryland*, No. 00 Civ. 1333, 2001 WL 11060, at *1 (S.D.N.Y. 2001); *see also Estee Lauder*, 2006 WL 1188183, at *7 n.1 ("Federal and state proceedings are concurrent or parallel for purposes of abstention when the proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same.").

Abercrombie has not persuasively demonstrated that this action and the action pending in Surrogate's Court are parallel. The subject matter is different — specifically, this Court must address the validity of the Deed, while the Surrogate's Court must address the validity of the Will proffered by Andrew College. Moreover, there is only a slight overlap in the parties as many more parties have a direct interest in the Surrogate's Court action than in this matter pending here. Furthermore, the outcome of each lawsuit will depend on mostly different facts — for example, the two contested documents in dispute were executed under different circumstances and at different times, and were witnessed by different individuals. Finally, even though both cases will be governed by state law, this does not create a parallelism between two actions connected by little more than some common parties. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 283 (1995) (holding abstention acceptable "where another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court . . . ."). Thus, Abercrombie has not established the essential element that there are parallel

proceedings.

However, assuming that the parallel proceeding prerequisite of the *Colorado River* test is met, the Court then proceeds to an evaluation of whether *Colorado River* abstention is warranted in this case. In evaluating whether abstention pursuant to *Colorado River* is appropriate, "a district court is required to weigh six factors, 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Village of Westfield*, 170 F.3d at 121 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983)). These six factors include:

> (1) the assumption of jurisdiction by either court over any res or property;
> (2) the inconvenience of the federal forum;
> (3) the avoidance of piecemeal litigation;
> (4) the order in which jurisdiction was obtained;
> (5) whether state or federal law supplies the rule of decision; and
> (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Id.* at 121 (quoting *Cone*, 460 U.S. at 16, 19-26). As "no single factor is necessarily decisive" and the "weight to be given to any one factor may vary greatly from case to case," this Court will consider each factor individually. *Id.*

Taking them in turn, it is clear that the balance of the six factors weighs against Plaintiff's request that this Court abstain. First, no court has assumed jurisdiction over the property at issue in this action by virtue of Plaintiff filing the action. Instead, as discussed above, the Property presumptively belongs to Andrew College unless a court agrees with Abercrombie's claim that the Deed is invalid. Second, the federal forum is no less convenient than the state forum would be, as both courts are located in New York City. "[W]here the federal court is 'just as convenient' as the state court, that factor favors retention of the case in federal court." *Village of*

*Westfield*, 170 F.3d at 122 (quoting *Youell v. Exxon Corp.*, 48 F.3d 105, 113 (2d Cir. 1995)).

Third, as noted above, the issues in the two actions are separate and distinct, thus there is no threat of piecemeal litigation. *See Celentano*, 602 F. Supp. at 782 (noting that there was little potential for duplicative litigation between federal case involving alleged contract to make a will and probate proceedings, where plaintiff's claims in federal court were never before the surrogate's court). Fourth, jurisdiction was obtained in this court before the Surrogate's Court proceedings were even initiated, and this case is further along than the Surrogate's Court proceedings. *See Village of Westfield*, 170 F.3d at 122 ("This factor does not turn exclusively on the sequence in which the cases were filed, 'but rather in terms of how much progress has been made in the two actions.'" (quoting *Cone*, 460 U.S. at 21)). Fifth, although state law provides the rule of decision on the merits in this case, "the absence of a federal issue does not strongly advise dismissal, unless the state law issues are novel or particularly complex." *Id.* at 124. Thus, because the state law issues are straightforward, this factor only marginally favors abstention. Sixth and finally, while the Surrogate's Court may be able to resolve the issues pending before this Court, a prompt decision is more likely from this Court. *Id.* (considering the "slow pace" of the state court proceeding to favor keeping the case before the federal court). Therefore, this Court will not abstain under *Colorado River*.[18]

_____

[18] While *Colorado River* requires "exceptional circumstances" to justify abstaining where there is pending state litigation, there is a less rigid "discretionary standard" where the federal action is one for declaratory relief. *See generally Wilton*, 515 U.S. 277. Abercrombie naturally urges the Court to abstain under the less rigorous *Wilton* standard. (Letter from Dollinger to the Court, Feb. 21, 2006) However, because the Complaint seeks more than just declaratory relief, the Court is to apply the more demanding *Colorado River* standard. *See Village of Westfield,* 170 F.3d at 124-25 n.5 ("*Wilton* does not apply here. Although Welch did seek a declaration of rights under the sewer agreement and the FWPCA, the federal action did not seek purely declaratory relief. Rather, the Village sought payment of the unpaid user charges against Welch.

Finally, the Court rejects Abercrombie's last argument that the state's "strong interest" in probate related matters mandates abstention. In support of this basis for abstention, Abercrombie primarily relies on the Second Circuit's 1973 decision in *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509 (2d Cir. 1973). In *dicta*, the *Phillips, Nizer* court observed that "there is a particularly strong reason for abstention in cases which, though not within the exceptions for matters of probate and administration or matrimony and custody actions are on the verge, since like those within the exception, they raise issues 'in which the states have an especially strong interest and a well-developed competence for dealing with them.'" *Id.* at 516 (quoting Charles Alan Wright, *Federal Courts* § 25, at 84 (2d ed. 1970)). Whatever may be said of the limits of that comment, the Second Circuit has explicitly declined to extend *Phillip, Nizer* in light of the Supreme Court's admonition in *Colorado River* regarding the federal courts' "unflagging obligation" to exercise their jurisdiction. *See Giardina*, 733 F.2d at 1052. Moreover, *Phillips, Nizer* is distinguishable in that it involved "a thicket of state decisional law," *Philips, Nizer*, 490 F.2d at 516, while this case involves relatively plain vanilla claims of undue influence and fraud, as well as hornbook law on *inter vivos* gifts. *See Giardina*, 733 F.2d at 1051 ("The claim of undue influence and fraud in obtaining the assignment in the case before us is a simple and largely factual question involving well-settled principles of state law. It is a garden

---

Welch, in turn, contested the payment and sought damages caused by the Village's conduct."); *BFI Waste Sys. of N. Am., Inc. v. Travelers Cas. and Sur. Co.*, No. 94-507, 1999 WL 813879, at *3 (D.N.H. Oct. 6, 1999) ("The Second . . . Circuit[] appl[ies] the *Colorado River* standard to decide abstention in cases with mixed claims."); *accord Southwind Aviation, Inc. v. Bergen Aviation, Inc.*, 23 F.3d 948, 951 (5th Cir. 1994) (noting that district court erred in classifying action as one for declaratory judgment when plaintiff also sought damages and other injunctive relief); *Water Quality Ins. Syndicate v. Inland Marine Mgmnt. Corp.*, No. 98 Civ. 2232, 1999 WL 195525, at *2 (E.D. La. 1999) (applying *Southwind*); *Am. Home Assurance Co. v. Roxco, Ltd.*, 81 F. Supp. 2d 674, 677 (S.D. Miss. 1999) (applying *Southwind*).

variety type in federal diversity jurisdiction, and it neither involves a 'controlling or obscure question of state law' nor requires special state expertise."); *Celentano*, 602 F. Supp. at 781-82 ([P]laintiff's contract claims and defendant's defenses comprise 'a garden variety' diversity case, involving neither the construction of a new or nonexisting statute, nor presenting '[c]omplex and unsettled issues of state law, whose resolution might well affect broad policies of the state.'" (citing *Quinn v. Aetna Life & Cas. Co.*, 616 F.2d 38, 41 (2d Cir. 1980))); *Bugbee*, 483 F. Supp. at 1332 (distinguishing *Phillips, Nizer*, noting that the action "is merely one to set aside an allegedly fraudulently induced conveyance of real estate; it involves no policy as to which the state has an especially strong concern, and no peculiar issues as to which the state probate court would have a special competence").  Therefore, the Court will not abstain in this action.

## B.    Andrew College's Motion to Dismiss

The Court now turns to Andrew College's Motion to Dismiss.  In this Motion, Andrew College seeks dismissal on the grounds that:  (i) all of the claims in the Complaint are time barred by the Statute of Limitations; (ii) the Complaint fails to state a cause of action as to the legality of the Deed; and (iii) the fraud allegations in the Complaint want for sufficient particularity under Fed. R. Civ. P. 9(b).

### 1.  Standard of Review

On a motion to dismiss, the district court must determine whether the complaint is legally sufficient — it is not concerned with weighing the evidence which would be presented at trial. *See Chosun Int'l Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).  Accordingly, a complaint should be dismissed only when it is clear that the plaintiff can present no set of facts which would entitle that plaintiff to relief consistent with the allegations.  *See Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).  This standard is even stricter where the motion to dismiss is based on statute of limitations defenses.  *See Meridien Int'l Bank Ltd. v. Liberia*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998).  In such an instance, the motion should not be granted unless it appears "beyond a doubt" that the plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief.  *Id.*; *see also Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 252 (S.D.N.Y. 2002).  Review of such a motion requires the court to accept the plaintiff's allegations in the complaint as true, and draw all inferences in favor of the plaintiff.  *See Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005).

In adjudicating a Rule 12(b)(6) motion, this Court is limited to considering "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (vacating 12(b)(6) judgment after district court made findings of fact based on evidence outside the pleadings without converting motion to one for summary judgment); *Tornheim v. Eason*, 363 F. Supp. 2d 674, 676 (S.D.N.Y. 2005) (allowing court to consider public records, even if document was not incorporated into the complaint by reference); *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (allowing defendant to produce a prospectus with its motion to dismiss which plaintiff failed to attach to the complaint).

### 2.  Statute of Limitations

#### a.  Applicable Statute of Limitations

In a diversity case filed in New York, the district court must apply New York's choice of law rules and statutes of limitations.  *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.

1998).  Under New York law, this Court must determine the substantive form of the remedy rather than the theory of liability put forth by the Plaintiff to determine which statute of limitation applies.  *See Leongard v. Santa Fe Indus., Inc.*, 514 N.E.2d 113, 115 (N.Y. 1987).  Plaintiff's Complaint alleges seven causes of action,[19] but in truth, the remedies sought may be divided into three categories.

First, Plaintiff seeks equitable remedies.  Causes of action, including equitable remedies, "for which no limitation is specifically prescribed by law" are governed by the six-year statute of limitations under New York law.  *See* N.Y. C.P.L.R. § 213(1).  Claims based in restitution, such as the claim for unjust enrichment, are also subject to this six-year statute of limitation.  *See Plitman v. Leibowitz*, 990 F. Supp. 336, 337 (S.D.N.Y. 1998).  As actions for a constructive trust

---

[19] Plaintiff's causes of action are summarized generally as follows:

1. To vacate the Deed which allegedly conveyed a remainder interest in Plaintiff's residence to Defendant as invalid on the grounds that it was an improperly executed testamentary instrument.  (Compl. ¶¶ 8-14)

2. To issue a declaratory judgment declaring the Deed and related instruments invalid.  (Compl. ¶ 16)

3. To revoke and rescind the Contribution Agreement between Plaintiff and Defendant, alleging that it was based on the invalid Deed and that no consideration was given for it.  (Compl. ¶¶ 18-21)

4. To vacate the Deed because of "fraud, undue influence, overreaching, inadequate counsel and conflict of interests."  (Compl. ¶¶ 23-29)  This cause of action alleges Plaintiff's supposed lack of intent to convey an irrevocable gift to Defendant, Plaintiff's reportedly inadequate counsel, and Defendant's alleged knowledge that Plaintiff did not understand the terms of the Deed, the Contribution Agreement, or the transaction in general.  (Compl. ¶¶ 23-29)

5. To vacate the Deed due to the unjust influence that Defendant exercised over Plaintiff by way of breach of a fiduciary relationship.  (Compl. ¶¶ 31-32)

6. To impose a constructive trust over the Property in favor of Plaintiff, due to Defendant's obtaining the residence by way of fraud.  (Compl. ¶¶ 34-35)

7. To award $1,000,000.00 in punitive damages, as well as attorneys' fees, to Plaintiff on the above stated grounds.  (Compl. ¶ 37)

are also based in restitution, they are also subject to the six-year statute of limitations. *See Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (App. Div. 1993).

Second, Murphy makes a number of property-based claims. (*See* Compl. ¶¶ 14, 16, 21, 28) The statute of limitations for an action to recover real property or the possession thereof is ten years. *See* N.Y. C.P.L.R. § 212(a); *P.A.C.W.S., Ltd. v. Reineke*, 572 N.Y.S.2d 42, 44 (App. Div. 1991) ("[T]he plaintiffs' complaint sufficiently set forth a cause of action seeking a judgment determining ownership of the property deeded to [defendant] . . . . The Statute of Limitations governing such a cause of action is 10 years.").

Third, Plaintiff's remaining claims primarily allege fraudulent conduct. Under New York law, an allegation of fraud may fall under one of two different statutes of limitations. A claim of actual fraud is subject to a two-year statute of limitation running from the time the plaintiff discovered, or could have with reasonable diligence discovered, the fraud. *See* N.Y. C.P.L.R. §213(8). However, if the Plaintiff fails to allege that the Defendant intentionally deceived Ms. Murphy or acted with a conscious disregard of her rights, Plaintiff's allegations merely establish a prima facie case of constructive fraud, not actual fraud. *See Fandy Corp. v. Chen*, 691 N.Y.S.2d 572, 573 (App. Div. 1999); *Brown v. Tonawanda Housing, Inc.*, 507 N.Y.S.2d 92, 93 (App. Div. 1986). A cause of action for constructive fraud runs from the alleged fraudulent action, not from the time of discovery, and is subject to a six-year statute of limitations. *See Brown*, 507 N.Y.S.2d at 93.

All of Plaintiff's causes of action are based on events which occurred in March 1990 at the signing of the Deed, or, at the latest, at the recording of the Deed in 1992. Applying either

the six or ten year statutes of limitations, all of these claims are time barred. The only claims that might not be time barred are those for fraud, but as discussed *infra*, Plaintiff fails to allege fraud with sufficient particularity. Therefore, it is impossible to determine whether these claims are time barred.

### b. Exceptions to the Statute of Limitations

Plaintiff argues that two exceptions to the statute of limitations bar the defense in this case. First, Plaintiff asserts that the statute of limitations is inapplicable to an action by an owner in possession to remove a cloud on the title. (Pl.'s Mem. of Law in Opp'n to the Mot. To Dismiss the Compl. ("Pl.'s Opp'n Mem.") 7) Second, Plaintiff asserts equitable estoppel as a defense to the statute of limitations.

### i. Owner in Possession Exception

Plaintiff claims relief from the statute of limitations from the "owner in possession" exception. The "owner in possession" exception allows the qualifying owner to "invoke the aid of a court of equity at any time while he is so the owner and in possession." *Piedras v. Vanover*, 579 N.Y.S.2d 675, 678 (App. Div. 1992) (quoting *Ford v. Clendenin*, 109 N.E. 124, 126 (N.Y. 1915)). The exception thus allows the owner to sue throughout his possession, without restriction by the statute of limitations. *Id*. This exception does not apply, however, to all plaintiffs who bring lawsuits over disputed property. Instead, the New York Court of Appeals has emphasized that "[t]he requirement of prompt action is imposed as a policy matter upon persons who would *challenge* title to property rather than those who seek to quiet title to their land." *Orange & Rockland Util., Inc. v. Philwold Estates*, 418 N.E.2d 1310, 1313 (N.Y. 1981). More particularly, to be covered by this exception to the statute of limitations, the plaintiff must

be "the owner and in possession." *Ford*, 109 N.E. at 126. Under the typical case involving this exception, the "owner of real property who is in real possession . . . may wait until his possession is invaded or his title is attacked before taking steps to vindicate his right." *Id.*

Plainly, this action does not seek to quiet Ms. Murphy's title to the Property, but in fact seeks to vacate and rescind Andrew College's title to the Property by virtue of the Deed that conveyed the Property from Ms. Murphy to Andrew College. Put another way, the premise of this lawsuit is that title to the Property should be returned to Ms. Murphy (or her estate) because she allegedly was induced to gift it to Andrew College through fraud and undue influence. Thus, even though Ms. Murphy was living on the Property at the time this action was filed, and thus satisfied the possession element of the exception, and even though it is claimed that she (or her estate) should be deemed to be the rightful owner of the property, Ms. Murphy presumptively ceased to be the title holder when the Deed was delivered twelve years before this lawsuit was filed.[20] *See Sofsky v. Rosenberg*, 564 N.E.2d 662, 663 (N.Y. 1990) ("Rosenberg's possession of the deed creates a presumption that the deceased grantor had delivered the deed to him before her death."); *Marlanx Corp. v. Lage*, 764 N.Y.S.2d 6, 8 (App. Div. 2003) ("As to the rights between grantor and grantee, transfer of title is effected by delivery and acceptance of an executed deed."). As such, the ownership element of the exception is not satisfied. *See Ford*, 109 N.E. at 126 ("[A]n owner in possession has a right to invoke the aid of a court of equity at any time while *he is so the owner* and in possession . . . .") (emphasis added); *James v. Lewis*, 522

_____

[20] Here, the language at the bottom of the Deed makes clear that Ms. Murphy transferred title to Andrew College. (Jakoby Decl. Ex. C ("TOGETHER with all right, title and interest, if any, of the party of the first part [Ms. Murphy] . . . TO HAVE AND TO HOLD the premises herein granted unto the party of the second part [Andrew College] . . . .")

34

N.Y.S.2d 897, 898 (App. Div. 1987) ("[B]ecause the plaintiff failed to establish that he was an owner in possession, the trial court properly concluded that challenges to the 1971 and 1974 conveyances were barred by the Statute of Limitations."). Thus, even if there is a valid basis for rescission of the Deed on the grounds, for example, of undue influence, and Ms. Murphy's estate should as a result be deemed to be the rightful owner of the Property, the untimely filing of the action is not excused.[21] *See Brown*, 507 N.Y.S.2d at 494 (holding that rescission action based on claim that plaintiff "did not convey title to her property to defendants and that defendants used undue influence and fraudulently induced her to sign deed" was subject to six-year statute of limitation).

### ii. Equitable Estoppel

Plaintiff also contends that equitable estoppel should prevent her case from being dismissed for being untimely. In particular, it is claimed for the first time in Plaintiff's Response that Ms. Murphy did not become aware until 2004 that the Deed had been recorded and was irrevocable.

Under New York law, "[e]quitable estoppel may arise when the defendant misrepresents to the plaintiff the time within which he may begin suit. Equitable estoppel may also arise when

---

[21] The Court recognizes that the absence of fraud may be required in order for title to pass with delivery of the deed, *see Herrmann v. Jorgenson*, 189 N.E. 449, 450 (N.Y. 1934) ("As there is no claim of fraud or the breach of any trust, we find the law to be that the delivery of this duly executed deed . . . passed title . . . ."), and that a claim of actual fraud alters the starting point for the Statute of Limitations. *See Fread v. Grabowski*, 552 N.Y.S.2d 415, 416 (App. Div. 1990) (noting that in case of alleged actual fraud, statute begins to run within two years of discovery of fraud and not when the Deed was executed). However, as noted *infra*, fraud is not pled with sufficient particularity. Without proper pleading of fraud, it cannot at this time be used to cast doubt on the delivery of the title to the Property to Andrew College, or to otherwise save the non-fraud causes of action that are clearly time barred.

affirmative fraudulent statements are made which conceal from the plaintiff facts essential to make out the cause of action."[22] *Renz v. Beeman*, 589 F.2d 735, 750 (2d Cir. 1979) (citations omitted); *accord Knaysi v. A.H. Robbins Co.*, 679 F.2d 1366, 1368 (11th Cir. 1982); *Anisfeld v. Cantor Fitzgerald & Co.*, 631 F. Supp. 1461, 1466 (S.D.N.Y. 1986) (citing *Parsons v. Dep't of Transp.*, 344 N.Y.S.2d 19, 24 (Sup. Ct. 1973)); *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978); *Gen'l Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 170-71 (N.Y. 1966). Under New York law, equitable estoppel refers to a court's power to bar the application of the statute of limitations due to representations or conduct by a party which induces the opposing party to postpone bringing suit on a known cause of action, or which fraudulently conceals an action unknown to the opposing party. *Knaysi*, 679 F.2d at 1368. It is, however, a doctrine to be "invoked sparingly and only under exceptional circumstances." *Matter of Gross v. New York City Health & Hosps. Corp.*, 505 N.Y.S.2d 678, 679 (App. Div. 1986).

> "The elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position . . . . "[23]

---

[22] Equitable estoppel is sometimes used interchangeably with the term "equitable tolling" in New York case law. Federal courts distinguish between the two. *See Coleman & Co. Sec. Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002).

[23] When a plaintiff alleges that the defendant concealed information which prevented the plaintiff from filing a timely action, but does not allege an actual misrepresentation, the plaintiff must adequately allege a fiduciary relationship which obligated the defendant to inform the plaintiff of the underlying, and allegedly concealed, information. *See Gleason v. Spota*, 599 N.Y.S.2d 297, 299 (App. Div. 1993). Contrary to Abercrombie's assertion, however, equitable estoppel is not "applied with more vigor against one who owes a fiduciary duty to the plaintiff."

*Smith v. Smith*, 830 F.2d 11, 12 (2d Cir. 1987) (quoting *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (App. Div. 1980)); *see also Bennett v. U.S. Lines, Inc.*, 64 F.3d 62, 65 (2d Cir. 1995); *Knaysi*, 679 F.2d at 1369.

If properly pled, allegations of equitable estoppel normally create questions of fact which cannot be determined at a motion to dismiss. *See Bennett*, 64 F.3d at 65; *Renz*, 589 F.2d at 750 n.15. However, without adequate pleading, the issue is not properly raised and therefore cannot defeat a motion to dismiss based on statute of limitations grounds. *See Dep't of Econ. Dev. v. Arthur Anderson & Co.*, 747 F. Supp. 922, 943 (S.D.N.Y. 1990) (dismissing cause of action because plaintiff made no allegation in complaint that "its failure to timely institute its third-party action was due to its justified reliance upon a misrepresentation" by opposing party); *Moll v. U.S. Life Title Ins. Co. of N.Y.* , 700 F. Supp. 1284, 1293 (S.D.N.Y. 1988) ("Plaintiffs have not alleged that defendant caused them to delay in bringing suit on a known cause of action. On the contrary, plaintiffs repeatedly emphasize that they did not discover the alleged . . . violations until long after the limitations period had expired. Equitable estoppel is therefore not appropriate in this case.").

Moreover, "equitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 167 (App. Div. 2003). Instead, the "opportunity to circumvent the Statute of Limitations [on the grounds of equitable

---

(Pl.'s Opp'n Mem.10). While courts apply equitable estoppel to breaches of fiduciary duty in the cases cited by Abercrombie, the application is not made with any more "vigor" than in cases in which no fiduciary duty was owed. *See Nick v. Greenfield*, 753 N.Y.S.2d 45, 46 (App. Div. 2002); *PET, Inc. v. Lusting*, 433 N.Y.S.2d 934, 935-36 (App. Div. 1980).

estoppel] is predicated . . . upon the plaintiff demonstrating that the defendant conducted himself in such an overt manner, *after his wrongdoing*, as to induce the plaintiff to delay commencement of her action on time or otherwise prevent her from doing so." *Burpee v. Burpee*, 578 N.Y.S.2d 359, 362 (Sup. Ct. 1991); *see also Smith*, 830 F.2d at 13 ("The doctrine of equitable estoppel usually comes into play when some conduct by a defendant after his initial wrongdoing has prevented the plaintiff from discovering or suing upon the initial wrong."). "[T]his limitation on the equitable estoppel doctrine must also apply to fraud actions, because otherwise, the mere assertion of an underlying fraudulent act would always trigger equitable estoppel and render the discovery accrual rule for fraud actions superfluous." *Kaufman*, 760 N.Y.S.2d at 167. In addition to this requirement, any claim that a defendant's fraudulent concealment bars invocation of a statute of limitations defense must comport with Fed. R. Civ. P 9(b) in that it must be sufficiently particularized. *See Moll*, 700 F. Supp. at 1289. Finally, Plaintiff must allege more than that the defendant remained silent regarding the initial wrong. *See Jordan v. Ford Motor Co.*, 426 N.Y.S.2d 359, 361 (App. Div. 1980) ("A party against whom a claim exists is not, without more, under a duty to inform the injured party thereof, and such failure to inform does not constitute the kind of fraudulent concealment which gives rise to an estoppel.").

Furthermore, even if a plaintiff sufficiently alleges misconduct by a defendant, the plaintiff also is required to allege that justifiable reliance upon the misrepresentation was the reason for failing to timely commence the action. *See id.* Specifically, "[a] party seeking to avoid the bar of the statute [of limitations] on account of fraud must aver and show that he used due diligence to detect it . . . ." *Moll*, 700 F. Supp. at 1293. "All that is needed to commence the running of the statute is 'knowledge of facts sufficient 'to suggest to a person of ordinary

intelligence the probability that he has been defrauded.'"" *Renz*, 589 F.2d at 751 (quoting

*Sielcken-Schwarz v. American Factors,* 192 N.E. 307, 310 (N.Y. 1934)).  Thus, where a plaintiff

possesses "timely knowledge sufficient to place him or her under a duty to make inquiry and

ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations,"

there can be no justifiable reliance, and equitable estoppel is inapplicable.  *Gleason*, 599

N.Y.S.2d at 299 (quotations omitted).

Plaintiff has the burden to establish that the action was brought within a reasonable time

after the facts giving rise to the estoppel itself.  *See Weizmann Inst. of Sci.*, 229 F. Supp. 2d at

252.  As a factual finding is required, it is typically inappropriate to determine whether or not

plaintiff has met this burden on a motion to dismiss.  *See Knaysi*, 679 F.2d at 1370.  This is not

the case, however, if the plaintiff fails to adequately plead the requisite facts in support of the

defense.  *See Moll*, 700 F. Supp. at 1293.  Thus, where a plaintiff does not sufficiently allege due

diligence in the complaint, mere allegations of the same are insufficient to toll the statute of

limitations.  *See id; see also Whitney Hldgs, Ltd. v. Givotovsky*, 988 F. Supp. 732, 747 (S.D.N.Y.

1997).

In this case, Plaintiff has failed to allege any facts that would support invocation of the

equitable estoppel doctrine.  First, Plaintiff does not identify the misrepresentations or other facts

demonstrating fraudulent concealment that could serve as the basis for the claimed equitable

estoppel.  More particularly, Plaintiff has utterly failed to identify in the Complaint which

statements led her to believe that she could delay bringing her lawsuit fourteen years after signing

the Contribution Agreement, let alone twelve years after the Deed was recorded.  The same is

true of any other representations allegedly made by Andrew College that supposedly concealed

facts that could have led Ms. Murphy to file this action earlier. Instead, the whole claim of

equitable estoppel appears to hinge on the non-particularized allegation that in 1990 Andrew

College told Ms. Murphy that the Deed was revocable, a representation which Abercrombie

claims was not corrected until 2004, after the statute of limitations already had run. However,

because that claim forms the basis of the fraud cause of action, it cannot serve as the grounds for

finding equitable estoppel. *See Smith*, 830 F.2d at 13 ("Because appellant has failed to disclose

any additional acts by appellee that were designed to place appellant's claim outside the

limitation period, she has not made out a case of equitable estoppel under New York law."); *see*

*also Kaufman*, 760 N.Y.S.2d at 167 ("In the present case, it is the very same wrongful act –

[Defendant's] misrepresentation and intentional concealment concerning the opportunity to

reacquire an interest in the Falchi Building – which forms the basis of both the equitable

argument and the underlying claims for fraud and breach of fiduciary duty. . . . Accordingly, . . .

plaintiffs may not avail themselves of the [equitable estoppel] doctrine here."). Moreover,

because even the allegation that Andrew College allegedly did not correct its earlier

representations regarding the purported revocability of the Deed until 2004 is made only in

Plaintiff's Memorandum of Law, and not in the Complaint or in an affidavit from Ms. Murphy,

the Court has little trouble finding that Abercrombie has failed to allege sufficient facts to

support the claim that Andrew College tricked Ms. Murphy into delaying this action. *See Smith*,

830 F.2d at 13 ("Because appellant has failed to disclose any additional acts by appellee that

were designed to place appellant's claim outside the limitation period, she has not made out a

case of equitable estoppel under New York law."); *Anderson Co. v. Devine*, 608 N.Y.S.2d 514,

515 (App. Div. 1994) ("[E]quitable estoppel is unavailable to the plaintiffs because of their

failure to assert it in their complaint.").

Finally, Plaintiff has not adequately plead due diligence. At any point, Plaintiff could have inquired about Andrew College's plans for the Property. After the Deed was recorded, it became a public record which Plaintiff easily could have discovered. *See Jacobsen v. Inc. Village of Russell Gardens*, 201 N.Y.S.2d 183, 186 (Sup. Ct. 1960) ("The Court has ascertained that this deed is a public record . . . ."); *see also Schwartz v. Ribaudo*, 101 N.Y.S. 599, 599-600 (Sup. Ct. 1906) ("The averment of the record of the deed placed the defendant in a position to at once obtain knowledge and information, and a party cannot plead ignorance of a public record to which he has access."). Without any allegations of diligent action on Plaintiff's behalf, Plaintiff cannot rely on equitable estoppel. *See Whitney Holdings.*, 988 F. Supp. at 747-48 ("To invoke equitable estoppel, plaintiff must demonstrate due diligence in bringing the cause of action and reasonable care in ascertaining facts which might have led to discovery of defendant's wrong. . . . [Plaintiff] has neither affirmatively pleaded diligence in bringing the action nor even asserted that it could not have discovered the facts underlying the claim until 1995. In short, [Plaintiff] has failed to allege its due diligence or reasonable care."); *see also Moll*, 700 F. Supp. at 1293 (noting that where plaintiffs had means of discovery in their power but exercised no due diligence, limitations period could not be tolled). Accordingly, the equitable estoppel doctrine does not toll the Statute of Limitations in this case. Therefore, Plaintiff's first through fifth and seventh causes of action must be dismissed as untimely.

### 3. The Deed is Not Testamentary As a Matter of Law

The First and Second causes of action in the Complaint allege that the Deed should be set aside on the ground that it is invalid. According to Plaintiff, the Deed conveys a property interest

which would take effect only upon Ms. Murphy's death, signifying that Ms. Murphy could not have intended to convey a present estate to Defendant.  (Pl.'s Opp'n Mem. 13)  This contention is based on the language of the Deed which reads as follows:  "It is the intention of the first party [Plaintiff] to retain a life estate in and to the above described property and to occupy the same during her lifetime, with the entire fee estate vesting in the second party upon the death of the first party."  (Compl. ¶ 12)  Based on this language, it is alleged that the Deed is not a valid *inter vivos* gift, but in fact, "constitutes a testamentary devise and the transfer of the remainder interest in [the Property] to defendant Andrew College was not executed with the testamentary formalities required by the State of New York."  (Compl. ¶ 13)  Put succinctly, it is alleged that the Deed was an improper attempt at a will.

"A valid inter vivos gift requires:  (i) intent on the part of the donor to make a present transfer; (ii) actual or constructive delivery of the gift to the donee; and (iii) acceptance by the donee."  *Rudolf Nureyev Dance Found. v. Noureeva-Francois*, 7 F. Supp. 2d 402, 415 (S.D.N.Y. 1998) (citing *Gruen v. Gruen*, 496 N.E.2d 896 (N.Y. 1986)).  There appears to be no dispute over the second and third elements – whether there was actual or constructive delivery of the gift, or acceptance by Andrew College.  Indeed, the fact that Andrew College has filed this Motion is evidence that it accepted the transfer of the Property, and, as previously noted, the Deed was properly recorded, thus presumptively delivering the gifted property to Andrew College.  Therefore, the focal point of the dispute is whether the Deed manifests an intent on Ms. Murphy's part to make a present transfer of the Property, even while retaining a life interest in it.

As a general matter, the law in New York is clear that a "donor may transfer ownership of a gift . . . and still retain actual possession of the property – reserving a life estate in the object,

for example, and transferring a remainder interest in the property to the donee – so long as the intention is to vest the donee then and there with dominion and control over the property and to divest the donor of dominion over it." *Nureyev Dance Found.*, 7 F. Supp. 2d at 415; *see also In re Brandreth's Estate*, 62 N.E. 563, 565 (N.Y. 1902) ("In this state a life estate and remainder can be created in a chattel or a fund same as in real property.").  However, "to say that the donor must relinquish dominion and control over the property is not, of course, to say that he may not retain any interest in the property or that the donee must be given present enjoyment of absolute ownership.  The decisions in [New York] clearly validate a gift of a remainder interest and a reservation of a life estate in the donor." *In re Sussman's Estate*, 125 N.Y.S.2d 584, 589 (Sur. Ct. 1953) (collecting cases); *see also Gruen*, 496 N.E.2d at 873 ("Insofar as some of our cases purport to require that the donor intend to transfer both title and possession immediately to have a valid inter vivos gift, they state the rule too broadly and confuse the effectiveness of a gift with the transfer of the possession of the subject of that gift.").

On the other hand, an instrument is testamentary if it vests no present interest in the recipient and instead only instructs what might be done with the property after the maker's death. *See Butler v. Sherwood*, 186 N.Y.S. 712, 714-15 (Sup. Ct. 1921); *see also Gruen*, 496 N.E.2d at 874.  Thus, for example, there is authority in New York to declare deeds invalid testamentary instruments when they are revocable and conditional on their face, *see Butler*, 186 N.Y.S. at 714-15, or when they state that no title or interest will pass from grantor or grantee until after grantor's death.  *See Boon v. Castle*, 115 N.Y.S. 583, 583 (Sup. Ct. 1908).

"There is an important distinction between the intent with which an inter vivos gift is made and the intent to make a gift by will." *Gruen*, 496 N.E.2d at 872.  "The correct test is

'whether the maker intended the [gift] to have *no effect* until after the maker's death, or whether he intended it to transfer *some present interest*.'" *Id.* at 873 (quoting *McCarthy v. Pieret*, 24 N.E.2d 102, 103 (N.Y. 1939)) (other citations omitted). In evaluating intent, the courts routinely look to the instrument executed by the donor. *See, e.g., In re Brandeth's Estate*, 62 N.E. at 564 ("The effect of these instruments was to transfer to the daughters the remainder in the stock after the donor's death, reserving to the latter an estate for his life."); *Rubenstein v. Rosenthal*, 528 N.Y.S.2d 539, 540 (App. Div. 1988) ("The intent to make a present transfer is evidenced by the terms of the letter itself, which contains a specific description of the property, including the exact acreage, the 50% interest which Rosenthal possessed in the property, and the specific, present, language 'I have granted you 10% of my share.'"); *Stoutenburg v. Stoutenburg*, 40 N.Y.S.2d 146, 147 (App. Div. 1943) ("The deed was effective to create in the grantee therein named a future estate in expectancy, limited to commence in possession on the death of the grantor.").

A careful review of the Deed in this case reveals that it unconditionally conveys a present interest in the Property to Andrew College, while retaining a life interest for Ms. Murphy. The Deed provides, in pertinent part:

> Together with the appurtenances and all the estate and rights of the party of the first part in and to the said premises.
>
> To have and to hold the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.
>
> [T]he party of the first part . . . does hereby grant and release unto the party of the second part, the heirs successors and assigns of the second part forever, the remainder interest of first party in and to [the Property].
>
> It is the intention of the first party to *retain* a life estate in and to

44

the above described property and to occupy the same during her
lifetime, with the entire fee estate vesting in the second party upon
the death of the first party.

(Jakoby Decl. Ex. D) (emphasis added)

A similar deed was at issue in *Stoutenburg*, *supra*.  The deed in that case read as follows:

Together with the appurtenances and all the estate and rights of the
party of the first part in and to the said premises from and after the
life estate of the party of the first part which is hereby *reserved*.

To have and to hold the above granted premises, unto the said party
of the second part, his heirs and assigns forever, beginning and
from the decease of the party of the first part.

It being the purpose and intention hereby that the party of the first
part shall *retain* and *reserve* the absolute title and possession of the
said premises during her natural life and at and after her decease
the title, ownership and possession of said premises hereby granted
shall then devolve upon and pass to the party of the second part, his
heirs and assigns.

And the said party of the first part, doth covenant with the party of
the second part as follows:

First.  That the part of the second part shall quietly enjoy the said
premises after the decease of the party of the first part.

*Stoutenburg*, 40 N.Y.S.2d at 147 (emphasis added).  As Plaintiff does here, the plaintiff in

*Stoutenburg* argued that the deed was "inoperative and void, because of the stated intention of

the grantor in the habendum clause to retain and reserve the *absolute title and possession* during

her natural life and after her decease the title, ownership and possession of the premises to *then*

devolve upon and pass to the party of the second part, his heirs and assigns."  *Stoutenburg v.*

*Stoutenburg*, 27 N.Y.S.2d 734, 736 (Sup. Ct. 1941).  Also, as here, the plaintiff in *Stoutenburg*

therefore "insist[ed] that the deed is an attempted will, and sought to convey the fee to take effect

45

at the death of the grantor and to retain to herself the absolute ownership of the property during her life." *Id.* In support of these contentions the *Stoutenburg* plaintiff principally relied on *Boon v. Castle*, and *Butler v. Sherwood*. *Id.* at 147-48.

The trial court in *Stoutenburg* disagreed and declared the deed valid. In so doing, the court focused on the language in the deed that explicitly provided that the grantor "reserved" a life interest in the property. As the trial court put it: "An exception and a reservation differ. A reservation takes back something already granted and concerns something issuing out of an estate. An exception concerns part of an estate and indicates that that contained in it was never granted." *Stoutenburg*, 27 N.Y.S.2d at 737. In affirming, the Appellate Division held that "the deed was effective to create in the grantee therein named a future estate in expectancy . . . , limited to commence in possession on the death of the grantor. *Stoutenburg*, 40 N.Y.S.2d at 147. According to the Appellate Division, "[s]uch estate was a remainder, 'descendible, devisable and alienable, in the same manner as an estate in possession.'" *Id.*

In upholding the validity of the deed, the trial and appellate courts in *Stoutenburg* distinguished *Boon* and *Butler*, both cases Plaintiff heavily relies upon here. (Pl.'s Opp'n Mem. 13-14) In *Butler*, the grantor gave a deed to her husband for consideration of "[one dollar], love and affection, and other good and valuable considerations," which purported to transfer to him all of the real and personal property owned by her at her death. *Butler*, 186 N.Y.S. at 713. However, the deed also provided: "This conveyance and transfer are made upon the condition that . . . my husband, survive me and the same is intended to vest and take effect only upon my decease, and until said time, the same shall be subject to revocation." *Id*. The *Butler* court noted that the grantor gave no present or future right of enjoyment in the instrument, since she withheld

the vesting until the time of her death. *Id.* at 714. Therefore, the instrument made no change in title during her lifetime. *Id.* Similarly, in *Boon*, the grantor delivered a deed to his nephew which stated: "This conveyance is made and delivered upon the express understanding and agreement that no title to or interest in any of the foregoing described property shall pass from the grantor . . . to the grantee . . . until the death of said grantor . . . ." *Boon*, 115 N.Y.S. at 583.

Thus, in neither *Butler* nor *Boon* was there an instrument that unconditionally transferred property from grantor to grantee. In contrast, the deeds in *Stoutenburg* and in this case contain language that expressly "retain" or "reserve" a life estate in the property for the grantor, while at the same time explicitly granting to the grantee the remainder interest upon the death of the grantor. (Jakoby Decl. Ex. D (noting that grantor "does hereby grant and release . . . the remainder interest")); *Stoutenburg*, 40 N.Y.S.2d at 147 (grantee's interest in property "hereby granted" in deed). When worded as such, even the *Boon* court allowed that such a deed would be a valid gift, noting that "[t]he grantor could have conveyed and reserved a life use to himself; the title then would have vested in the grantee subject to the life estate." *Boon*, 115 N.Y.S. at 584. Thus, the cases relied upon by Plaintiff do not alter the conclusion that the Deed validly gifts the Property to Andrew College.[24] *See Stoutenburg*, 40 N.Y.S.2d at 148 (distinguishing deeds in

---

[24] Counsel for Abercrombie attempt to escape the on-point holding in *Stoutenburg* through two arguments. First, counsel point to the portion of the Deed which provides "with the entire fee estate vesting in the second party upon the death of the first part." (Pl.'s Opp'n Mem. 15) Counsel argues that this language "creates an exception that postpones the vesting of the entire interest," thus distinguishing the Deed in this case from the one in *Stoutenburg*. (Pl.'s Opp'n Mem. 15) However, counsel disingenuously leaves out the prefatory clause wherein Ms. Murphy agrees that it is the "intention of the first party to *retain* a life estate in and to the above described property and to occupy the same during her life time." (Jakoby Decl. Ex. D) When considered in its entirety, it is clear that the Deed does permit Ms. Murphy to *retain* her life interest in the property, while at the same time granting title of the Property to Andrew College.

*Butler* and *Boon*).

Finally, Plaintiff alleges that Ms. Murphy believed the Deed to be revocable at the time of drafting. Indeed, had the Deed expressed a right of revocability, it might not be valid. However, Plaintiff does not, and cannot credibly point to a provision within the Deed which makes the gift revocable.[25] Moreover, to the extent that Plaintiff claims that she was deceived into executing the Deed because of alleged fraud and undue influence by Andrew College, that is a question addressed in the other causes of action in the Complaint, but not one appropriately addressed here. Instead, the sole question raised in the first two causes of action is whether, on its face, the Deed should be declared an invalid *inter vivos* gift because it does not comport with the testamentary requirements of New York law. The Court holds that based on the plain language of the Deed, the Deed properly conveys the Property to Andrew College and, therefore, the first two causes of action fail to state a claim and are dismissed.[26]

---

Second, counsel argue that *Stoutenburg* should be limited by the fact that the deed in that case involved a "mother's natural grant of the family farm to her son who resided with her and worked the farm." (Pl.'s Opp'n Mem. 15 (quoting *Stoutenburg*, 27 N.Y.S.2d at 736)) However, the quote relied upon is from the trial court's decision. Nothing in the appellate division's decision remotely limits the holding in that case to the facts surrounding the grantor and grantee. Instead, the appellate division's holding in *Stoutenburg* solely depended on the wording of the deed and applicable case law. *See Stoutenburg*, 40 N.Y.S.2d at 148 (noting that the trial court's holding found "ample support" in the law of New York and other jurisdictions).

[25] Plaintiff's argument is further undermined by the Contribution Agreement accompanying the Deed, which is entitled "Remainder Interest Charitable Contribution Agreement." (Jakoby Decl. Ex. C) In particular, the Contribution Agreement provides that Ms. Murphy "wishes to *retain* the lifetime use of and benefits from the Property, *and* to contribute a remainder interest in the Property" to Andrew College. (Jakoby Decl. Ex. C ¶ C) (emphasis added)

[26] The third cause of action seeks rescision of the Contribution Agreement on the ground that the underlying Deed is invalid. Therefore, this cause of action is dismissed as well.

## 4.  Failure to Adequately Plead Andrew College's Fraud and Fiduciary Duty

Plaintiff's fourth and sixth causes of action allege that Ms. Murphy was the victim of fraudulent conduct on the part of her *alma mater*, Andrew College.  Defendant moves to dismiss this cause of action on the ground that it is not pled with particularity.  In order to give a defendant clear notice of a plaintiff's claims, and to protect a defendant from undue harm to its reputation, allegations of fraud must be plead with specificity.  *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir. 1979).  Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Specifically, the Second Circuit has "read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough."  *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 639 (E.D.N.Y. 2003) (quoting *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir. 1982)).  These requirements ensure that "a complaint alleging fraud" is filed "only after a wrong is reasonably believed to have occurred," and "not to find one."  *Segal v. Gordon*, 467 F.2d 602, 607-08 (2d Cir. 1972).

However, Rule 9(b) must be read in light of the liberal pleading requirement of Rule 8, which only requires a "short and plain statement" of the claim.  *See Quaknine v. McFarlane*, 897 F.2d 75, 79 (2d Cir. 1990).  Plaintiff is not required to plead with detailed evidence.  *See Kravetz*

*v. Brukenfeld*, 591 F. Supp. 1383, 1386 (S.D.N.Y. 1984). Accordingly, allegations may be made

on information and belief where the fraud is based on matters within the adverse party's sole

knowledge, but still must be accompanied by a statement of the facts upon which the belief is

founded. *See Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, No. 03 Civ. 0971, 2004 WL

51224, at *4 (S.D.N.Y. Jan. 9, 2004); *see also Morgan v. Prudential Group, Inc.*, 81 F.R.D. 418,

423-24 (S.D.N.Y. 1979).

Here, Plaintiff's Complaint does not come close to pleading fraud with the requisite

particularity. In fact, beyond the conclusory statement that "the totality of the circumstances of

this case are rife with fraud," (Compl. ¶ 26) the *only* allegation of fraudulent statements is in

Paragraph 34, where it is alleged:

> That Defendant obtained the residence from Plaintiff by fraud; that
> Defendant ANDREW COLLEGE made oral representations to
> Plaintiff assuring her that the deed was revocable; that Plaintiff
> reasonably relied on the oral representations made by Defendant
> when she signed the deed of conveyance; that if Defendant is allowed
> to keep the deed to her residence, Defendant will be unjustly
> enriched.

(Compl. ¶ 34) While Plaintiff need not go into great detail in the pleadings, it is never stated

who made the misrepresentations, when or where they were made, or the contents of the

statement which allegedly assured Ms. Murphy that the deed was revocable. Moreover, an oral

representation to Plaintiff would not be in Defendant's sole knowledge, and thus should be plead

with more specificity by Plaintiff. Therefore, Plaintiff's fraud based claims are deficient under

Fed. R. Civ. P. 9(b).[27] *See Petrello v. White*, 412 F. Supp. 2d 215, 235 (E.D.N.Y. 2006)

_____

[27] Plaintiff's fifth cause of action also alleges that Defendant unduly influenced Ms.
Murphy into signing over the Deed. (Compl. ¶¶ 26, 27, 31) While undue influence need not be

(dismissing counterclaim based in fraud because it failed to identify any specific fraudulent statements).

Plaintiff attempts to cure the insufficient allegations of fraud, by alleging that Ms. Murphy and Andrew College were in a fiduciary relationship and therefore, that the burden shifts to Andrew College to prove that the Deed was not the product of fraud or undue influence. (Pl.'s Mem. at 18-22) Indeed, the law in New York is that the existence of a fiduciary relationship

---

pled with the particularity required by Rule 9(b), *see Medeiros v. John Alden Life Ins. Co. of N.Y.*, No. 89 Civ. 1278, 88 Civ. 4399, 1990 WL 115606, at *3 n.4 (S.D.N.Y. Aug. 10, 1990), the elements of an undue influence claim must be set forth in the pleadings. *See In re Conover's Estate*, 297 N.Y.S. 577, 582 (Sur. Ct. 1937). In New York, a plaintiff alleging undue influence must establish: (1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind at the time the transaction occurred; and (3) the execution of the transaction that, but for undue influence, would not have happened. *See Halvorsen v. Sheive*, No. 02 Civ. 6187, 2004 WL 627939, at *8 (W.D.N.Y. Feb. 10, 2004).

The Complaint is short on details, but essentially alleges that Andrew College was engaged in a conspiracy with others not specifically identified to take advantage of Ms. Murphy's age and loneliness to unduly influence her to execute the Deed. (Compl. ¶ 26) Yet, the Complaint concedes that Ms. Murphy was represented by counsel in the transaction (but who allegedly, though again without any details, provided inadequate counsel to Ms. Murphy), and otherwise does not specify any of the specific means by which Andrew College allegedly conspired to exercise undue influence on Ms. Murphy. Moreover, the Complaint does not even allege that the gift was Andrew College's idea or that Ms. Murphy somehow was incapable, in spite of her advanced age, supposed "lack of business savvy" and purported "loneliness," of making decisions on her own, particularly when represented by her own attorney. Thus, simply alleging that she was elderly and friendly with her *alma mater* along with merely stating that there was a conspiracy involving undue influence is of questionable sufficiency. *See Spallina v. Giannoccaro*, 469 N.Y.S.2d 824, 827 (App. Div. 1983) (noting that undue influence cause of action was "facially defective inasmuch as [it failed] to set forth the elements"); *see also Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) ("So the question comes down to whether the bare allegation that a defendant conspired with other defendants whose unlawful acts are adequately alleged satisfies Rule 8 as to that defendant. We think not."); *Triple Canopy, Inc. v. Moore*, No. 04 Civ. 3265, 2005 WL 1629768, at *13 (N.D. Ill. July 1, 2005) ("[A] plaintiff cannot satisfy federal pleading requirements merely 'by attaching bare legal conclusions to narrated facts which fail to outline the bases of [her] claim.'") (quoting *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991)). However, because the undue influence claim is otherwise time barred, the Court need not reach that question at this point.

transfers the burden to the donee to establish that a gift was not the product of fraud, undue

influence, or coercion.  *See Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 385 N.E.2d 285,

288-89 (N.Y. 1978).

To determine if a fiduciary relationship exists, "New York law inquires whether one

person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a

resulting superiority or influence over the first."  *Teachers Ins. & Annuity Assoc. of Am. v.

Wometco Ent., Inc.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993).  Thus, a fiduciary duty exists

where one assumes control and responsibility over another, or where one has a duty, created by

his undertaking, to act primarily for the benefit of another in matters connected with his

undertaking.  *See id.*; *see also Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App.

Div. 1987) (noting that a "fiduciary relation exists between two persons when one of them is

under a duty to act for or to give advice for the benefit of another upon matters within the scope

of the relation" (quoting Restatement (Second) of Torts § 874 cmt. a)).  "Examples of fiduciary

relationships include the relationships between trustee and beneficiary, guardian and ward, agent

and principal, and attorney and client."  *Wilson-Rich v. Don Aux Assocs., Inc.*, 524 F. Supp. 1226,

1234 (S.D.N.Y. 1981).  On the other hand, fiduciary relationships typically do not arise between

parties engaging in arms length business transactions, *see Mid-Island Hosp., Inc. v. Empire Blue

Cross and Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002), especially those where the parties are

each represented by counsel or other professional advisors.  *See Grumman Allied Indus., Inc. v.

Rohr Indus., Inc.*, 748 F.2d 729, 739 (2d Cir. 1984).

The existence of a fiduciary duty normally depends on the facts of a particular

relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to

dismissal under Rule 12(b)(6). *See Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03 Civ. 2820, 2004 WL 633730, at *3 (S.D.N.Y. March 30, 2004). However, absent an allegation of a special relationship, mere assertions of "trust and confidence" are insufficient to support a claim of a fiduciary relationship. *See Freedman v. Pearlman*, 706 N.Y.S.2d 405, 409 (App. Div. 2000). Thus, for example, "the fact that one party trusts the other is insufficient to create a fiduciary relationship." *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 797 (N.D. Ill. 1987). Moreover, the elements of a breach of fiduciary duty based in fraud must be plead with particularity. *Frota v. Prudential-Bache Secs., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty — statutory, common law, tort, contractual, or fiduciary."). At bottom, "[i]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Diamond Phoenix Corp. v. Small*, No. Civ. 05-79, 2005 WL 1530264, at *6 (D. Me. June 28, 2005).

The Complaint in this case fails to sufficiently allege a fiduciary relationship between Ms. Murphy and Andrew College. The claim regarding the relationship between Ms. Murphy and her *alma mater* is found in one paragraph in the Complaint, which merely alleges, that

> as a result of several years of knowing [Andrew College], there developed between the parties a calculated friendship that resulted in trust and reliance; that [Andrew College] knew that Plaintiff would rely in [Andrew College's] recommendations to her concerning the transfer of her residence; [Andrew College] took advantage of Plaintiff's age and loneliness and exercised undue influence in inducing Plaintiff into transferring deed to her residence over to [Andrew College].

(Compl. ¶ 31)  It is readily apparent from this limited allegation that there was only a "calculated friendship," whatever that is, between Ms. Murphy and Andrew College that "resulted in trust and reliance."  However, the courts routinely have held that "conclusory allegations of a 'special relationship,' [and] 'complete trust and confidence'" are insufficient to state a claim of a fiduciary duty.  *Holloway v. King*, 361 F. Supp. 2d 351, 361 (S.D.N.Y. 2005); *see also Rosenblatt v. Christie, Manson & Woods Ltd.*, No. 04 Civ. 4205, 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) ("Nor can a fiduciary relationship be found based on a plaintiff's repeated conclusory assertion of a relationship of 'trust and confidence.'" ); *Diamond Phoenix*, 2005 WL 1530264, at *5 (noting that conclusory allegation of a special relationship was insufficient to survive motion to dismiss); *Wilson-Rich*, 524 F. Supp. at 1234 ("Contrary to plaintiff's assertions, . . . a confidential relationship is not synonymous with a fiduciary relationship.").  Nor can it be said that the mere relationship between an *alumnae* and her *alma mater*, even if a close one, automatically imposes a fiduciary duty on the college when accepting a donation, particularly where the Complaint acknowledges that the *alumnae* was represented by counsel in the transaction.  Indeed, as alleged, it only can be said that, as a matter of law, it was Ms. Murphy's attorney who owed her a fiduciary duty in this transaction.  *See Diversified Group., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 457 (S.D.N.Y. 2001) (noting attorney's duty of confidence and loyalty to every client).  However, Plaintiff has cited no authority, and the Court is unaware of any, that remotely suggests that Andrew College was required to act in Ms. Murphy's interests in accepting her donation.  Indeed, absent any other allegations regarding Andrew College's conduct, the "relationship" alleged in the Complaint is typical of that between many wealthy *alumnae* and their *alma maters*, and does not establish, by itself, the existence of a

fiduciary duty. *Cf. Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 569 (App. Div. 2005) ("The record is wholly devoid of any indication that plaintiffs' relationships with defendants were unique or distinct from defendants' relationships with other parishioners."). Therefore, the allegation in the Complaint fails to shift the burden to Andrew College to justify the donation and, more importantly, fails to relieve Plaintiff from pleading fraud with particularity. Accordingly, the fourth and sixth causes of action are dismissed.

### 5. Leave to Amend

Courts which dismiss pleadings because they fail to state a claim often grant plaintiffs leave to amend under Rule 15(a). *See, e.g., Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (noting that complaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend). However, in making a motion for leave to amend, plaintiffs must attach a proposed amended complaint so that the Court and the opposing party has an opportunity to understand the exact changes proposed. *See Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993).

In the circumstances of this case, the Court believes it appropriate to give Plaintiff an opportunity to seek leave to amend the Complaint. If counsel for Abercrombie seeks such leave, the Court of course assumes that they will be conscious of their obligations under Rule 11 to ensure that any proposed Amended Complaint contains "allegations and other factual contentions [that] have evidentiary support." Fed. R. Civ. P. 11(b)(3). Here, the Court's concern is not abstract, but informed by developments in this case since the Complaint was filed. First, Ms. Murphy has passed away, thus potentially limiting the ability of counsel to particularize the allegedly fraudulent statements by Andrew College to her in 1990. Second, Andrew College has produced numerous documents which shed light on the transaction at issue. While wholly

irrelevant for purposes of considering the instant motion, these documents may limit

Abercrombie's counsel in any effort to supplement the conclusory and boilerplate allegations in

the defective Complaint.  For example, Andrew College has produced two letters, dated February

25, 1991 and April 4, 1991 (Affidavit of Kirk Treible, Ex. A and B), which reflect that Ms.

Murphy was counseled in the transfer of the Property, that her counsel only approved the

transaction after a tax opinion was provided to him, and that within two months of learning the

views of her counsel, Ms. Murphy explicitly authorized Andrew College in the April 4, 1991

letter to "proceed with the recording of the deed for the property that I am giving to Andrew

College and in which I am retaining a life interest."  (Treible Aff., Ex. A)  In fact, the April 4

letter reflects Ms. Murphy's satisfaction with the "establishment of the Liddie Murfi Center for

the Communication Arts as outlined in the resolution passed by the Board of Trustees of Andrew

College which accepted the gift."  (Treible Aff., Ex. A)  Furthermore, there are other letters from

Ms. Murphy, including one dated November 25, 1994, where Ms. Murphy comments with

satisfaction that she "gave Andrew my property," and later notes her relief that she did not let her

niece "Nancy" come to New York to live with her.  (Letter from Jakoby to the Court, Sept. 30,

2005, Ex. B)

## III. CONCLUSION

Plaintiff's Complaint is DISMISSED in its entirety, without prejudice. Plaintiff is

granted twenty (20) days to seek leave to file an Amended Complaint, but must provide a copy of

the proposed Amended Complaint along with an application seeking leave to amend.

SO ORDERED.

Dated:     June 13, 2006
           New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:

Charles M. Mirotznik
Law Offices of Charles M. Mirotznik
444 Madison Avenue, Suite 701
New York, NY 10022

Matthew Dollinger
Dollinger, Gonski & Grossman
One Old Country Road, Suite 102
Carle Place, NY 11514

Richard Young Im
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016

Arthur G. Jacoby
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016